**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **PATRICK C. LYNN,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 5:19-cv-03117-HLT** |
| **CHARLIE WILLNAUER, et al.,** | |
| **Defendants.** | |

**MEMORANDUM AND ORDER**

Plaintiff, Patrick C. Lynn, brings this pro se prisoner civil rights case under 42 U.S.C. § 1983. Plaintiff is incarcerated at the Lansing Correctional Facility in Lansing, Kansas ("LCF"). The Court granted Plaintiff leave to proceed in forma pauperis. (Doc. 28.) This matter is before the Court for screening Plaintiff's First Amended Complaint ("FAC") pursuant to 28 U.S.C. § 1915A.

**I. Nature of the Matter before the Court**

**A. Procedural Background**

Plaintiff initiated this case by filing his original Complaint (Doc. 1) on July 2, 2019, alleging that he was in imminent danger of serious physical injury. Plaintiff's Complaint was not on the court-approved form as required by D. Kan. Rule 9.1. Plaintiff included with his Complaint a letter to the Clerk stating that:

> . . . LCF prison officials unlawfully & corruptly refuse to provide any free court forms for prisoner petitions, & as such I humbly here request you please send me 10 § 1983 lawsuit forms & 5 IFP Application forms so I can re-submit this suit on the required form & also submit additional § 1983 separate suits for ongoing rabid constitutional abuses by LCF prison officials.

(Doc. 1–2.)  On July 3, 2019, the Clerk mailed Plaintiff ten civil rights complaint forms and five forms for seeking leave to proceed in forma pauperis.  On that same date, the Court entered a Notice of Deficiency (Doc. 2) advising Plaintiff that his Complaint was not upon court-approved forms and granting him until August 2, 2019, in which to correct the deficiency.

On July 16, 2019, Plaintiff filed a motion for orders (Doc. 6), indicating that "he is in the process of drafting his First Amended Complaint utilizing the required form." (Doc. 6, at 1.)  On July 29, 2019, Plaintiff requested an additional thirty days to submit his amended complaint. (Doc. 8, at 3.)

On August 1, 2019, the Court entered an order denying Plaintiff's motion for filing fee waiver based on imminent dangers of serious physical injury and denied his motion to proceed in forma pauperis in light of his status as a three-strikes litigant under 28 U.S.C. § 1915(g).  (Doc. 10.) The Court also granted Plaintiff until August 19, 2019, to submit the filing fee.  *Id.*  Plaintiff filed a notice of interlocutory appeal on August 8, 2019, and the Court dismissed this case for failure to submit the filing fee on August 21, 2019.  (Doc. 18.)  On August 27, 2019, Plaintiff filed a Notice of Appeal.  (Doc. 20.)  On September 3, 2020, the Court received the mandate from the Tenth Circuit Court of Appeals, finding that Plaintiff was in imminent danger at the time of filing, vacating this Court's orders denying Plaintiff's motion to proceed in forma pauperis and dismissing this action, and remanding the case to this Court for consideration of his claims in the first instance.  (Doc. 27.)

On September 8, 2020, the Court entered an Order granting Plaintiff's motion for leave to proceed in forma pauperis and granting Plaintiff an extension of time until October 5, 2020, to submit his amended complaint on court-approved forms.  (Doc. 28.) On September 16, 2020, Plaintiff filed a motion seeking a sixty-day stay of all proceedings and deadlines in this case.

(Doc. 29.)  The Court granted the motion to the extent that the Court granted Plaintiff a thirty-day extension of time to submit his amended complaint, granting him until November 5, 2020, in which to submit his amended complaint on court-approved forms.  (Doc. 30.)  On October 29, 2020, Plaintiff filed a "Motion for Final 10 Days' Time Extension to File Amended Complaint" (Doc. 32).  On October 20, 2020, the Court entered an order granting the extension and noting that "[t]he Court is not inclined to grant any further extensions."  (Doc. 33.)  The order further noted Plaintiff's filing restrictions and provided that "the Court is not inclined to authorize any additional filings from Plaintiff until Plaintiff has filed his amended complaint and the complaint has survived the Court's screening under 28 U.S.C. § 1915A."[1]  *Id.*  Plaintiff was granted until November 16, 2020, in which to submit his amended complaint on court-approved forms.  *Id.*  On November 16, 2020—the due date for filing his amended complaint—Plaintiff filed a motion seeking a sixty-day stay of the case.  (Doc. 36.)  The Court granted Plaintiff a sixty-day extension of time to submit his amended complaint, but denied the other relief requested in the motion.  (Doc. 37.)  The Court granted Plaintiff until January 15, 2021, to submit his amended complaint on court-approved forms.  *Id.*

On December 9, 2020, this case was reassigned to the undersigned for all further proceedings.  (Doc. 39.)  On December 31, 2020, Plaintiff submitted another proposed filing to the Court, which was not an amended complaint on a court-approved form.  The Court denied the proposed filing but granted Plaintiff until February 8, 2021, to submit a proper amended complaint on a court-approved form.  (Doc. 40.)  Plaintiff finally submitted his FAC on February 8, 2021.

---

[1] The Court cautioned Plaintiff in this order as well as others, to refrain from submitting any filings other than his amended complaint.  Despite the Court's orders, Plaintiff has submitted numerous proposed filings that were denied for failure to comply with the Court's filing restrictions set forth in this Court's Memorandum and Order Imposing Filing Restrictions (Doc. 29) in Case No. 20-3116-EFM.  *See* Docs. 31, 34, 35, 41, 42 and 44.

(Doc. 43.)[2]  The Court will now screen Plaintiff's FAC pursuant to 28 U.S.C. § 1915A.

**B.  Allegations in Plaintiff's FAC**

Plaintiff alleges in his FAC that he had a quadruple heart bypass operation on July 3, 2014, and was advised by the heart surgeon that the entire bottom half of his heart is dead muscle. Plaintiff has suffered multiple heart attacks and hospitalizations every year since the heart surgery. Plaintiff, as well as multiple prison medical staff have been advised by doctors and cardiologists that Plaintiff's heart condition cannot be remedied by any further surgery or stents, and the only thing keeping him alive is the stack of heart medications he is prescribed to take daily and the nitro vial he keeps with him.  Plaintiff has been consistently told by multiple cardiologists from the original heart surgeon to every cardiologist since then—which Plaintiff claims is nearly two dozen—that undergoing an EKG will never test normal and that the "gold standard" for Plaintiff's individual condition is to test Plaintiff's blood troponin enzyme level because an elevated level signifies serious damage to the heart muscle.

Plaintiff alleges that the troponin enzyme level range in a healthy person is zero to 0.07 ng/ml (nanograms per milliliter).  In 2018, LCF Dr. Ellis Williams had Plaintiff's troponin base level taken during a thirty-day calm period and it was determined to be 0.002.  In August 2019, Plaintiff's base troponin level was again tested by Dr. Williams and determined to be at 0.001 during a thirty-day calm period.

1.  Medical Care on May 25, 2019

Plaintiff was transferred to LCF on May 23, 2019.  He alleges that on May 25, 2019, he suffered severe heart attack symptoms and was taken to the LCF clinic E/R and was briefly seen

---

[2] Although Plaintiff submitted his FAC on February 8, 2021, three of the pages were cut off at the margins and were not fully legible.  The Clerk's office requested that Plaintiff re-scan the pages, but he declined.  However, an additional filing by Plaintiff included the re-scanned pages and the Court added these to his FAC on February 18, 2021.  *See* Doc. 44.  Plaintiff's complete FAC, including the re-scanned pages, is docketed at Doc. 43–3.

by RN Melissa.  LPN Sinclair took Plaintiff's blood pressure, which was elevated.  Plaintiff alleges that they left him for 45 minutes and "deliberately refused to enact the established 'Corizon chest pains protocol' which mandates [an] EKG, starting an IV, administering aspirin to chew up, & faxing the EKG graph to [the] 'on call' cardiologist & contacting the 'on call' Corizon physician for instructions & whether or not to take a Traponin [sic] blood sample & test it stat."  (Doc. 43–3, at 9.)  Plaintiff alleges that because the nurses refused to attend to his condition, Lt. Lee contacted Capt. Gallagher and she came on the scene and then caused RN Tom to assess Plaintiff.  RN Tom then enacted the chest pains protocol and was instructed to take a troponin sample.  Plaintiff was returned to his cell to await the result, which took over five hours even though the hospital lab was only three miles away.

Plaintiff's troponin sample came back at 0.116 ng/ml, and Dr. Monir directed Plaintiff to be rushed to the nearest hospital.  Plaintiff was taken to St. John's Hospital in a KDOC car with two escorts.  Plaintiff alleges that he was denied pain medication before his transfer to the hospital, and that he had suffered with immense heart spasms, difficulty breathing, and sharp pains in his jaw, left arm and neck for nearly eight hours.  At the hospital, Plaintiff was injected multiple times with morphine and fentanyl, was placed in the ICU for three to four days, and was then returned to LCF.

Plaintiff alleges that despite his complaints, as well as RN Tom's write-up on the two nurses involved, nothing was done to hold the nurses accountable by HSA McCullough, staff at LCF or Corizon medical staff.

### 2. Medical Care on June 22–28, 2019

Plaintiff alleges that on June 22, 2019, he suffered another heart attack and was taken to the LCF Clinic E/R and received the chest pains protocol by RN Laura Gardner.  She reported

Plaintiff's condition to the on-call physician, Dr. Monir, and he ordered a troponin test. The test came back in about an hour at .0135, and Dr. Monir ordered Plaintiff transferred by ambulance to KU Medical Center. The EMS staff transporting Plaintiff injected him with fentanyl. Plaintiff was admitted for four days, was treated with pain medication every four hours, and was then returned to LCF on June 25, 2019.

Upon his return to LCF, Plaintiff was placed in segregation, but was returned to the clinic E/R a few hours later on another chest pains medical emergency. Plaintiff was assessed by Nurses Layton and Gunter, who followed the chest pains protocol and took a troponin sample that came back at 0.116. APRN Kaur and Dr. Lewis-Harris readmitted Plaintiff to the Infirmary and placed him on a schedule to have a troponin test every twelve hours. Plaintiff alleges that he was denied pain medication despite his symptoms. Plaintiff alleges that his next troponin test came back at 0.117, yet he was discharged and returned to segregation on June 26, 2019, while still suffering heart attack symptoms.

Plaintiff alleges that he could no longer tolerate the urgency of his continuing heart attack symptoms, so he declared another chest pains medical emergency on that same day—June 26, 2019. Plaintiff was readmitted to the Infirmary and another troponin sample was taken and came back at 0.127. Plaintiff alleges that he was denied pain medication per Dr. Willnauer and Dr. Lewis-Harris, and his pleas to be transported to the hospital were denied by APRN Kaur, HSA McCullough, and per both doctors.

On June 27, 2019, when Plaintiff's pleas to RN Gardner to speak with other medical staff were ignored, Plaintiff "angrily demanded" to be taken to the hospital or returned to segregation. Security staff were summoned and Major Stuart Bailey, SST Pool, UTM Parks, and CSI Wall

came on scene and ignored Plaintiff's pleas for transfer to outside medical facilities and instead moved Plaintiff to a "lockbox security cell" in the Infirmary.

Around 8 p.m. on June 27, 2019, RN Yoakum took Plaintiff's troponin sample and told Plaintiff that she and other nurses were alarmed that Plaintiff was not taken to the hospital or given pain medication. RN Yoakum told Plaintiff that it took six hours for Plaintiff's sample to be picked up and taken to the St. John's lab three miles away. Plaintiff's sample registered at 0.124 and RN Yoakum informed Plaintiff that Dr. Lewis-Harris had declared that it was costing too much money to keep sending Plaintiff to the hospital. RN Yoakum informed Plaintiff the she and other nurses were aware that McCullough, Willnauer and Lewis-Harris were intentionally prolonging Plaintiff's immense heart attack symptoms and pain and suffering, and had the intent to cause Plaintiff a crippling stroke or fatal heart attack.

On June 28, 2019, at 1:45 p.m., Dr. Willnauer came to Plaintiff's infirmary lockbox security cell and refused to send Plaintiff to the hospital or to give Plaintiff pain medication. Plaintiff asked to be discharged from the infirmary and returned to segregation so that he could call his family. Plaintiff was thereafter discharged from the infirmary, charged with and convicted of threatening physical harm to Dr. Willnauer, and sentenced to ten days of disciplinary segregation.

### 3. Keep on Person Medication

Plaintiff alleges that around July 1, 2019, he requested the segregation med-techs to take back several of Plaintiff's non-heart medication Keep on Person ("KOP") cards because Plaintiff was struggling with swallowing around 16 pills per day. Plaintiff told them that Dr. Williams said he was going to re-examine the situation and had no issue with eliminating Plaintiff's non-heart medication KOP cards. Plaintiff alleges that the med-techs refused to take the KOP cards and told

Plaintiff that they did not care what Plaintiff did with them.  Plaintiff states that he tossed the empty cards outside of his cell and onto the floor, where they were scooped up by segregation security staff and returned to the LCF Pharmacy room.

Plaintiff alleges that around July 4, 2019, he submitted his empty heart meds KOP cards to a med-tech for renewal and she informed Plaintiff that she had been told by LPN Brandy Cobb that Plaintiff had tossed all of his KOP cards out of his cell and that per Cobb and Dr. Willnauer, Plaintiff was now prohibited from having any KOP med cards, including those for heart medications.

On July 15, 2019, Plaintiff met with Dr. Williams as Dr. Willnauer "sat in the room mute." Plaintiff explained to Dr. Williams what had happened regarding the KOP cards, and Dr. Williams agreed to reinstate Plaintiff's KOP heart medications.  A few hours later, Dr. Williams personally delivered a stack of heart medication KOP cards to Plaintiff in segregation, and Dr. Williams had RN Jordan Madorin also personally deliver another stack to Plaintiff.

Plaintiff alleges that on September 23, 2019, he was transferred to El Dorado Correctional Facility ("EDCF"), and all of Plaintiff's KOP cards were seized because EDCF segregation prisoners are not allowed any type of KOP medication cards and must submit to a med-tech placing unknown pills into a cup of water.  Plaintiff alleges that he refuses to submit to that "life-threatening process" because medical staff are "routinely" mixing up prisoner medications and passing out the wrong medication.  Plaintiff alleges that on July 10, 2014, Plaintiff was given the wrong medication by LCF RN Teddy Scott, who was fired for the incident.  Plaintiff has also attached exhibits consisting of affidavits from other inmates, one declaring that staff at EDCF attempted to give him the wrong medication on September 21, 2020 (Doc. 43–2, at 3.)  Another inmate declared that while at EDCF on August 24, 2020, an RN for Centurion put the wrong

medication in his cup of water, he discovered the error before taking the medication, and then the RN apologized for the error.  *Id*. at 4.

Plaintiff alleges that while at EDCF in 2019 and 2020, he suffered multiple serious cardiac events and was told that Dr. Williams had failed to enter a written order into Plaintiff's medical records reinstating Plaintiff's KOP heart medications and that Plaintiff was still subject to the LCF Cobb-Willnauer KOP medication prohibition.  Plaintiff states that he believes Dr. Williams did place his July 15, 2019 KOP reinstatement order in writing in Plaintiff's medical records and that such "was criminally deleted by Dr. Willnauer, LPN Cobb and others."  (Doc. 43–3, at 19.)

Plaintiff alleges that when he was subsequently housed at the Hutchinson Correctional Facility ("HCF") he attempted to get his KOP medications reinstated and was unsuccessful. Although APRN Shantal Powers attempted to reinstate them, HSA Lundry refused to allow it. Plaintiff alleges that UTS Hurt investigated and told Plaintiff that he had told Warden Schnurr that he believed Lundry was interfering with the KOP reinstatement.

On July 1, 2020, while housed at EDCF, Plaintiff went to the clinic having heart spasms and an elevated blood pressure.  While there, Dr. Herrod indicated that Lundry had no authority to overrule the KOP reinstatement by APRN Powers on March 30, 2020, and Dr. Herrod reinstated Plaintiff's KOP heart medications.  Plaintiff alleges that he was given a seven-day supply, the matter was resolved by July 17, 2020, and Plaintiff has received his KOP heart medications since that date.

### 4.  Medical Care on December 30-31, 2019

Plaintiff alleges that on December 30, 2019, while housed at HCF, he suffered severe heart attack symptoms and was placed into the HCF Infirmary.  A troponin sample was taken, and Nurses Denton and Dickinson claimed that the result was 0.007.  Plaintiff alleges that he knew this

result was absurd considering his "sky-high racing B/P" and symptoms.  Plaintiff alleges that from 6 p.m. that night until 10 a.m. on December 31, 2019, he was denied heart and pain medications, his blood pressure was not reassessed, and his troponin levels were not retested.  Plaintiff alleges that at 2 a.m. he declared that he was having a heart attack.  Captain Koob and several security staff members came into Plaintiff's room in the infirmary and refused to call EMS to transport Plaintiff to the hospital or to have the nurses reassess Plaintiff.

Plaintiff alleges that at 10 a.m. on December 31, 2019, Dr. Monir came to Plaintiff's room in the Infirmary with RN Pritchard, CO1 Cowan, and CO1 Smith.  Plaintiff had taken his fourth nitro tablet about twenty minutes before they arrived.  RN Pritchard took Plaintiff's blood pressure which was 188 over 110 plus.  Dr. Monir told RN Pritchard to take a troponin sample "stat" because they were probably going to send Plaintiff to the hospital again.  About three hours later, Cowan and Smith came to return Plaintiff to his general population handicap cell, informing Plaintiff that he was discharged from the Infirmary.  They were surprised that Plaintiff's troponin sample had not been taken, and on the way to Plaintiff's cell they questioned Pritchard as to why it had not been done.  Pritchard responded that he had not heard Dr. Monir order a troponin sample. When the guards informed Pritchard that they had heard the order from Dr. Monir, Pritchard checked Plaintiff's records on the computer and stated that Dr. Monir had not put the troponin request in writing.  Pritchard stated that he would attempt to contact Dr. Monir to verify the request. Ninety minutes later Plaintiff was assessed and had his blood pressure checked by Nurse Faye Vargas, who indicated they were unable to contact Dr. Monir and that she did not have the authority to order the troponin sample.

5.  Medical Care on July 27 and 31, 2020

Plaintiff alleges that he suffered a cardiac event at EDCF on July 27, 2020, and was

admitted to the EDCF Infirmary.  RN Brian Ross injected Plaintiff with morphine and declared that providing pain medication such as morphine to cardiac patients like Plaintiff is "standard established written protocol and medical standard operating procedure."  (Doc. 43–3, at 15.) Plaintiff alleges that after receiving his morphine injection he was discharged from the Infirmary.

Plaintiff alleges that on July 31, 2020, he suffered another cardiac event, was taken to the EDCF Infirmary after a three hour delay, and was injected with morphine by RN Ross and per Dr. Herrod.   Plaintiff alleges that despite Plaintiff declaring a "heart attack medical emergency" CSI Echols, CO2 Galli, CO1 Calhoun, and Captain Carrell delayed taking him to the Infirmary for three hours.   Plaintiff alleges that he was discharged from the Infirmary and given an additional injection of Ativan by RN Ross and per Dr. Herrod.

### 6.  Property Claims

Plaintiff alleges that upon his transfer back to LCF on November 9, 2020, his legal and personal property was routinely destroyed, resulting in missing files.  Plaintiff alleges that this was done in retaliation for his exercise of his First Amendment rights.

### 7.  Medical Care on November 11, 2020

Plaintiff alleges that on November 11, 2020, CSI Sutley ignored Plaintiff's request to go to the clinic due to chest pains for two hours.  A radio emergency was then called, and RN Liz came to Plaintiff's cell, recorded his blood pressure at 177 over "high 90's" and had the SST's take Plaintiff to the clinic.  Plaintiff alleges that he was "taken to the absurd LCF 'E/R' open side clinic area & [his] B/P taken again at 187/high 90's & [he] was given a futile EKG & Traponin [sic] sample taken & [he] was left to suffer [his] symptoms in this area."  (Doc. 43–3, at 15.)

Plaintiff alleges that RN Liz returned 30 minutes later to retake another troponin sample, indicating that the first sample had coagulated.  Plaintiff alleges that this only occurs if the sample

is left unrefrigerated.  Plaintiff alleges that RN Liz and another RN attempted several times to take another sample but could only get a "trickle."  Plaintiff alleges that Dr. Willnauer then came on the scene and told them to disregard taking another sample and that he was discharging Plaintiff. Plaintiff alleges that Dr. Willnauer refused to give Plaintiff anything for his awful heart spasms. When Plaintiff told Dr. Willnauer that RN Brian Ross and Dr. Herrod had given Plaintiff morphine and Ativan at EDCF, Dr. Willnauer stated that it was not standard protocol and that he would call to verify that it was done.  Plaintiff alleged that Dr. Willnauer called Dr. Herrod and he denied giving morphine to Plaintiff but acknowledged that he was given Ativan.  Plaintiff responded that this was "bullshit" because Plaintiff "knows what morphine feels like."  (Doc. 43–3, at 16.) Dr. Willnauer refused to order another troponin test or to transport Plaintiff to the hospital.  He gave Plaintiff a 1 mg Ativan pill and Plaintiff was taken back to his general population cell. Dr. Young, a visiting doctor, issued Plaintiff a standing order for 1 mg of Ativan twice daily.

### 8.  Medical Care on December 17-23, 2020

Plaintiff alleges that from December 17 through the end of December, he suffered continuing severe heart attack symptoms, was transported to the KU Medical Center by EMS multiple times, and was admitted for two days on December 18 and 19, 2020.  A cardiologist at the hospital changed Plaintiff's heart medication and Plaintiff was injected with fentanyl multiple times by EMS and hospital staff.

On December 22, 2020, while confined in the LCF Infirmary, Plaintiff asked CS1 Kelly to call the nurse due to another crushing heart attack and Plaintiff's need for more nitro tablets because he had spilled his on the floor.  Plaintiff alleges that RN Victoria arrived with EMT Marla Aguilar and the RN demanded to take Plaintiff's blood pressure before giving him a nitro tablet. She gave him the nitro tablet after his blood pressure was tested at 187/94.  Plaintiff alleges that

after five minutes he was still struggling with chest pain and trouble breathing and the EMT told the RN that she had to wait ten minutes before giving Plaintiff another nitro tablet. Plaintiff alleges that "long ago established protocols" require a maximum of three nitro tablets spaced five minutes apart, and if there is no relief after the third nitro tablet they should get the patient to a hospital or call EMS.

Plaintiff alleges that he showed the RN Plaintiff's KU Medical Center records from the previous day and asked the RN to find somebody that knew what they were doing. Plaintiff alleges that he received his second nitro tablet about twenty minutes after the first one, and then his blood pressure was taken a few minutes later. Plaintiff alleges that his blood pressure was 148/81 "allegedly" but he was still struggling. He demanded a third nitro tablet and to be taken to the hospital. Plaintiff alleges that Dr. Bocquin then arrived and "was preposterously trying to interrogate [Plaintiff] w/absurd questions that [Plaintiff] refused to submit to." (Doc. 43–3, at 17.) Dr. Bocquin then left and Plaintiff asked Lt. Bousfield and other security staff to call EMS. They refused and left Plaintiff to suffer for two hours. CSI Kelly then came back and Plaintiff told him to get a nurse or call EMS because Plaintiff had a heart attack. About thirty minutes later EMS arrived at Plaintiff's room and transported him back to KU Medical Center.

Plaintiff alleges that once he arrived at KU Medical Center he was placed in an E/R room and given an IV and an EKG, another troponin sample was taken, and then he was left in the room for forty-five minutes. Plaintiff and his two escorts—Baughman and Chadwick—sat in the room watching Plaintiff's blood pressure hover at 197/161 for over thirty minutes. SST Baughman left to get a nurse and returned with RN Hurtado, who was "rude & mean spirited" and only gave Plaintiff a nitro tablet and four baby aspirin to chew up. She left and returned thirty minutes later

with Dr. Kristi Bernath and another male resident, and they told Plaintiff they were discharging him and that his troponin level showed "zero."

Plaintiff was transferred back to LCF, and Dr. Willnauer authorized another troponin sample at 10:30 p.m.  The next day—December 23, 2020—LPN Amy and RN Emily told Plaintiff that it took six hours to obtain the troponin results.  The results came back at 0.234—the highest Plaintiff had ever tested.  LPN Amy and RN Emily notified Dr. Willnauer of the results. Dr. Willnauer failed to send Plaintiff to the hospital, but ordered another troponin test.  The test came back at 0.237.  Plaintiff alleges that no other troponin tests were taken, Plaintiff was not given any pain medication other than Ativan, and Plaintiff was not taken to the hospital.  Plaintiff alleges that he was left to continue suffering unbearable heart attack symptoms for weeks thereafter with no follow-ups and deliberate indifference by DON/RN Brian Burns.

9.  Grievances

Plaintiff alleges that he made multiple complaints to staff regarding his medical care.  On December 25, 2020, he presented his complaints and claims to Deputy Warden Skidmore at Plaintiff's cell door, thereafter in person to Major Ball on January 12, 2021, via Injury Claims dated December 31, 2020, and in writing to Kansas Governor Laura Kelly.  Plaintiff alleges that these complaints and claims were deliberately ignored by all LCF and Kansas Department of Corrections ("KDOC") Topeka officials, and the timeframes to reply have long since passed.

10.  Pattern and Custom

Plaintiff alleges that his medical claims show a continuing pattern of deliberate indifference to his serious medical condition and needs, by subjecting him to substandard medical care and causing him irreparable heart muscle damage and diminished life expectancy.  Plaintiff claims that he has been subjected to pain and suffering that constitutes medical malpractice, criminal

mistreatment, and numerous Eighth Amendment violations.   Plaintiff alleges that "it is the entrenched custom & practice of defendants & their agents, to continue the status quo culture of actionable unconstitutional & criminal abuses—whether it's done under the former Corizon Medical provider contractor . . . or under the current Centurion medical contractor flag because the same entrenched wrongdoers like Willnauer & Lundry, et al. are simply rehired by the incoming contractor & they continue their actionable wrongdoing w/impunity, just like KDOC officials do." (Doc. 43–3, at 19.)

### 11. Retaliation

Plaintiff claims that he has been subjected to continuing retaliations by the LCF property room staff and other LCF and KDOC defendants who have repeatedly destroyed Plaintiff's legal and personal property each time he is returned to LCF.  Plaintiff claims that these actions are meant to hinder and deprive Plaintiff of meaningful court access in violation of the First Amendment. Plaintiff claims that these actions also constitute criminal mistreatment and interference with the administration of justice under state law, citing K.S.A. 21-5105.

### 12.  Complaints to Boards

Plaintiff alleges that his complaints to the Kansas State Board of Nursing, Kansas State Board of Healing Arts, and Kansas State Board of EMT's, are conspiratorially suppressed and not acted upon as required by law.  Plaintiff claims that he is being arbitrarily discriminated against because he is a prisoner, and is being denied due process and equal protection in having his complaints seriously investigated and acted upon.

### 13.  Counts in Plaintiff's FAC

Plaintiff brings the following counts in his FAC:

Count I:   "The Defendant KDOC & Medical Providers have subjected Plaintiff to a continuing series of actionable deliberate indifferences to his serious medical condition & needs & caused him to suffer multiple irreparable injuries & prolonged pain & sufferings in violation of the 8th Amendment to the U.S. Constitution."  (Doc. 43–3, at 3.)

Count II:   "The Defendant KDOC & Medical Providers have subjected Plaintiff to criminal mistreatment, obstructions of justice, criminal deprivations of property, medical malpractices in violation of state laws & in violation of the Plaintiff's 8th Amendment rights under the U.S. Constitution to be free of cruel & unusual punishments."  (Doc. 43–3, at 3.)

Count III:   Plaintiff alleges that his First, Fourth and Fourteenth Amendment rights have been "maliciously violated by the LCF KDOC property room staff (Gable, Shaw, Thornton, Winklebauer & Price) who have repeatedly destroyed his legal & personal property each time he is transferred back to LCF."  (Doc. 43–3, at 20.)  Plaintiff further alleges that LCF and KDOC Topeka official have repeatedly ignored and/or denied his administrative claims in retaliation for Plaintiff exercising his First Amendment rights to seek redress from the courts.  *Id.*

Count IV:  Plaintiff alleges that Governor Kelly and officials employed with the Kansas State Board of Healing Arts, the Kansas State Board of Nursing and the Kansas State Board of EMTs, have violated his Fourteenth Amendment rights to due process and equal protection.  In support of his claim, Plaintiff alleges that his allegations in his FAC demonstrate serious and actionable medical malpractices that require investigation and suspensions or permanent forfeitures of those medical practitioners' licenses.  (Doc. 43–3, at 20.)  Plaintiff alleges that the agency officials "conspiratorially refuse to act on the facts & evidences presented to them by Plaintiff & unconscionably discriminate against Plaintiff because he & similarly situated others are prisoners."  *Id.*

14.  Request for Relief

Plaintiff seeks the following relief in his FAC:  "Award court costs, filing fees, & atty. fees/costs; appt. counsel for all phases of litigating this case; recognize Melgren's corrupt retaliations & refusals to comply w/28 USC § 144 & denying my 1st/14th Amendments w/his filing restrictions vindictiveness now subject to SCOTUS appeals in Cline & Lundry & cannot be applied to this case which requires judicial integrity to vacate & recuse Melgren permanently; trial by jury on all issues triable; compensatory damages in excess of $75k; punitive damages in excess of $100k; nominal damages; injunctive relief to be determined; all such other relief as is just, proper & equitable; referrals to US Atty. for investigation & prosecution; referral to federal grand jury per 18 USC § 3332(a) re 18 USC §§ 241, 242, 371 violations."  (Doc. 43–3, at 5.)

## II.  Statutory Screening of Prisoner Complaints

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or an employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if a plaintiff has raised claims that are legally frivolous or malicious, that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1)–(2).

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins,* 487 U.S. 42, 48 (1988) (citations omitted); *Northington v. Jackson*, 973 F.2d 1518, 1523 (10th Cir. 1992).  A court liberally construes a pro se complaint and applies "less stringent standards than formal pleadings drafted by lawyers."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  In addition, the court accepts

all well-pleaded allegations in the complaint as true. *Anderson v. Blake*, 469 F.3d 910, 913 (10th Cir. 2006). On the other hand, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," dismissal is appropriate. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

A pro se litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citations omitted). The complaint's "factual allegations must be enough to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Id.* at 555, 570.

The Tenth Circuit Court of Appeals has explained "that, to state a claim in federal court, a complaint must explain what each defendant did to [the *pro se* plaintiff]; when the defendant did it; how the defendant's action harmed [the plaintiff]; and, what specific legal right the plaintiff believes the defendant violated." *Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007). The court "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (citation omitted).

The Tenth Circuit has pointed out that the Supreme Court's decisions in *Twombly* and *Erickson* gave rise to a new standard of review for § 1915(e)(2)(B)(ii) dismissals. *See Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) (citations omitted); *see also Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). As a result, courts "look to the specific allegations in the complaint to determine whether they plausibly support a legal claim for relief." *Kay*, 500 F.3d at

1218 (citation omitted).  Under this new standard, "a plaintiff must 'nudge his claims across the line from conceivable to plausible.'"  *Smith*, 561 F.3d at 1098 (citation omitted).  "Plausible" in this context does not mean "likely to be true," but rather refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent," then the plaintiff has not "nudged [his] claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citing *Twombly*, 127 S. Ct. at 1974).

## III. DISCUSSION

### A. Personal Participation

Plaintiff names about 115 defendants in his FAC.  Plaintiff has failed to allege how many of those named defendants personally participated in the deprivation of his constitutional rights.  He appears to rely on the supervisory status of some of the defendants.  An essential element of a civil rights claim against an individual is that person's direct personal participation in the acts or inactions upon which the complaint is based.  *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985); *Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006); *Foote v. Spiegel*, 118 F.3d 1416, 1423– 24 (10th Cir. 1997).  Conclusory allegations of involvement are not sufficient.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").  As a result, a plaintiff is required to name each defendant not only in the caption of the complaint, but again in the body of the complaint and to include in the body a description of the acts taken by each defendant that violated plaintiff's federal constitutional rights.  Plaintiff must allege facts describing the unconstitutional acts taken by each defendant including dates, locations, and circumstances.

Mere supervisory status is insufficient to create personal liability. *Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir. 2008) (supervisor status is not sufficient to create § 1983 liability).  An official's liability may not be predicated solely upon a theory of respondeat superior.  *Rizzo v. Goode*, 423 U.S. 362, 371 (1976); *Gagan v. Norton*, 35 F.3d 1473, 1476 n.4 (10th Cir. 1994), *cert. denied*, 513 U.S. 1183 (1995).  A plaintiff alleging supervisory liability must show "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation."  *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010), *cert. denied*, 563 U.S. 960 (2011).  "[T]he factors necessary to establish a [supervisor's] § 1983 violation depend upon the constitutional provision at issue, including the state of mind required to establish a violation of that provision."  *Id*. at 1204 (citing *Iqbal*, 129 S. Ct. at 1949).

Plaintiff fails to mention the following defendants in the body of his FAC and fails to allege how they personally participated in the violation of his constitutional rights:  Millie Murray-Tringale; John Does 1–15 KODC Employees at LCF; (fnu) Edmonds; (fnu) Kohl; (fnu) Harter; (fnu) Hydro; (fnu) Jeffries; Dan East; (fnu) Wyatt; (fnu) Herrin; Terry Webster; Tommy Williams; Clay Vanhoose; Andrew Brown; (fnu) Perry; (fnu) Blaine; (fnu) Fischer; John Markus; Costy Mattar; John Doe Hutchinson Medical Center Doctor; Carol Mooreland; Jane Doe (1) Kansas Board of Nursing Investigator; Jane Doe (2) Kansas Assistant Attorney General, Kansas State Board of Nursing; Jane Doe (3) Kansas Assistant Attorney General, Kansas State Board of Nursing; Tucker Poling; Joseph Crumpton; (fnu) Sayeed; Mary Einerson; (fnu) Delpergang; (fnu) Yari; John Doe RN at EDCF on 7/27–31/20; (fnu) Early; (fnu) (lnu) (1) 500 lb. Black Woman

UTM at EDCF; Mike Dragoo; Terry Nichols; (fnu) Johnson; (fnu) Darter; (fnu) Christian; and John Cannon.  These defendants are dismissed from this action.

### B.  Medical Care

The Eighth Amendment guarantees a prisoner the right to be free from cruel and unusual punishment.  "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).

The "deliberate indifference" standard includes both an objective and a subjective component.  *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (citation omitted).  In the objective analysis, the deprivation must be "sufficiently serious," and the inmate must show the presence of a "serious medical need," that is "a serious illness or injury." *Estelle*, 429 U.S. at 104, 105; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), *Martinez*, 430 F.3d at 1304 (citation omitted).  A serious medical need includes "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Martinez*, 430 F.3d at 1304 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

 "The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety."  *Id*. (quoting *Sealock*, 218 F.3d at 1209).  In measuring a prison official's state of mind, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1305 (quoting *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996)).

A mere difference of opinion between the inmate and prison medical personnel regarding diagnosis or reasonable treatment does not constitute cruel and unusual punishment.  *See Estelle*,

429 U.S. at 106–07; *see also Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. 1968) (prisoner's right is to medical care—not to type or scope of medical care he desires and difference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983).

A complaint alleging that plaintiff was not given plaintiff's desired medication, but was instead given other medications, "amounts to merely a disagreement with [the doctor's] medical judgment concerning the most appropriate treatment." *Gee v. Pacheco*, 627 F.3d 1178, 1192 (10th Cir. 2010) (noting that plaintiff's allegations indicate not a lack of medical treatment, but a disagreement with the doctor's medical judgment in treating a condition with a certain medication rather than others); *Hood v. Prisoner Health Servs., Inc.*, 180 F. App'x 21, 25 (10th Cir. 2006) (unpublished) (where appropriate non-narcotic medication was offered as an alternative to the narcotic medication prescribed prior to plaintiff's incarceration, a constitutional violation was not established even though plaintiff disagreed with the treatment decisions made by prison staff); *Carter v. Troutt*, 175 F. App'x 950 (10th Cir. 2006) (unpublished) (finding no Eighth Amendment violation by prison doctor who refused to prescribe a certain pain medication where he prescribed other medications for the inmate who missed follow-up appointment for treatment and refused to be examined unless he was prescribed the pain medication he wanted); *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992) ("Plaintiff's belief that he needed additional medication, other than that prescribed by the treating physician, as well as his contention that he was denied treatment by a specialist is . . . insufficient to establish a constitutional violation.").

"[A] difference of opinion with the medical staff as to the optimal pain-management regimen does not amount to deliberate indifference." *Todd v. Bigelow*, 497 F. App'x 839, 842 (10th Cir. 2012) (unpublished) (citing *see Thompson v. Gibson*, 289 F.3d 1218, 1222 (10th Cir.

2002) ("[A] medical difference of opinion . . . is not actionable under the Eighth Amendment.")).

Where a prisoner is experiencing pain but has not been denied all pain medication, the choice of

pain medication by the medical staff "simply does not demonstrate subjective deliberate

indifference." *Vreeland v. Fisher*, 682 F. App'x 642, 649 (10th Cir. 2017) (unpublished) (citing

*Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006)).

Delay in providing medical care does not violate the Eighth Amendment, unless there has

been deliberate indifference resulting in substantial harm. *Olson v. Stotts*, 9 F.3d 1475 (10th Cir.

1993). In situations where treatment was delayed rather than denied altogether, the Tenth Circuit

requires a showing that the inmate suffered "substantial harm" as a result of the delay. *Sealock v.

Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (citation omitted). "The substantial harm

requirement 'may be satisfied by lifelong handicap, permanent loss, or considerable pain.'" *Mata

v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th

Cir. 2001)).

"A prison medical professional who serves 'solely . . . as a gatekeeper for other medical

personnel capable of treating the condition' may be held liable under the deliberate indifference

standard if she 'delays or refuses to fulfill that gatekeeper role.'" *Id*. (citing *Sealock,* 218 F.3d at

1211; *see also Estelle,* 429 U.S. at 104–105, 97 S. Ct. 285 (deliberate indifference is manifested

by prison personnel "in intentionally denying or delaying access to medical care")).

The Court finds that the proper processing of some of Plaintiff's medical claims cannot be

achieved without additional information from appropriate officials of LCF and HCF. *See Martinez

v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *see also Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991).

Accordingly, the Court orders the appropriate officials of LCF and HCF to prepare and file a

*Martinez* Report. Once the report has been received, the Court can properly screen Plaintiff's

medical claims under 28 U.S.C. § 1915.  Plaintiff is cautioned that no answer or motion addressed to the FAC shall be filed until the *Martinez* Report required herein has been prepared.

The Court will order a *Martinez* Report regarding Plaintiff's medical care on May 25, 2019 at LCF; June 26–28, 2019 at LCF; December 30–31, 2019 at HCF; and December 23, 2020 at LCF.  Regarding medical care on these dates, the Report should address:  the failure to provide Plaintiff with pain medication; the delay in receiving troponin test results; and the failure to transport Plaintiff to the hospital in light of elevated troponin test levels.

However, the Court finds that Plaintiff has failed to state a claim for relief against various defendants who provided him with medical care.  Although Plaintiff names Lt. Lee, SST Conard, and Captain Gallagher as defendants, nothing in Plaintiff's allegations regarding his medical care on May 25 suggests that they were deliberately indifferent to Plaintiff's medical needs.  In fact, Plaintiff claims that when the nurses refused to attend to his condition, Lt. Lee contacted Captain Gallagher and she came on the scene and directed RN Tom to assess Plaintiff.  Defendants Lee, Conard and Gallagher are dismissed for failure to state a claim against these defendants.

Plaintiff's allegations regarding his medical care on December 31, 2019, fail to state a claim against CO1 Cowan and CS1 Trevor Smith.  Plaintiff alleges that these two defendants arrived at the infirmary with Dr. Monir and later escorted Plaintiff to his cell after he was discharged.  Plaintiff has failed to show that these defendants acted with deliberate indifference to his medical care and they are dismissed.

Plaintiff alleges that there was a delay in being transferred to the Infirmary at EDCF on July 31, 2020.  Plaintiff acknowledges that despite the delay, he was taken to the Infirmary and received medical care including injections of morphine and Ativan. Plaintiff fails to show that the

defendants escorting him to the Infirmary were deliberately indifferent to his medical needs. Defendants CS1 Galli, CO1 Calhoun, and Captain Carrell are dismissed.[3]

Plaintiff also fails to state a claim for relief regarding his medical care on November 11, 2020 at LCF.  Plaintiff alleges CS1 Sutley delayed taking him to the clinic and RN Liz had to retake his troponin test, but he fails to name them as defendants.  Plaintiff acknowledges that he received medical care that day, but takes issue with being taken to the "absurd LCF 'E/R' open side clinic area", argues that a second troponin test was attempted because the first sample coagulated, and alleges that he was only given Ativan and not morphine.  Plaintiff alleges that Dr. Young wrote Plaintiff a standing order for Ativan on November 11, 2020.   Plaintiff's allegations do not show that Dr. Young was deliberately indifferent to his medical needs, and his claims against Dr. Young are dismissed. Plaintiff's allegations regarding his medical care on this date show a mere difference of opinion between the inmate and prison medical personnel regarding diagnosis or reasonable treatment.  Plaintiff's claims regarding his medical care on November 11, 2020, are dismissed.

The Court also dismisses Plaintiff's claims against RN Victoria, EMT Marla Aguilar, Dr. Bocquin, Lt. Bousfield, CS1 Kelly, and KU Medical Center staff regarding his medical care in December 2020.  Plaintiff acknowledges that he was transported the hospital multiple times. Plaintiff disagrees with the timing of his nitro pills by RN Victoria and EMT Marla Aguilar. Plaintiff also takes issues with Dr. Bocquin leaving after Plaintiff admittedly refused to answer the doctor's questions.  *See Lynn v. Peltzer,* Case No. 16-3096-JTM-DJW (D. Kan. July 29, 2016) (Doc. 37, at 9), *appeal dismissed* (10th Cir. Dec. 20, 2016) (Doc. 50) ("Mr. Lynn is not entitled to

---

[3] Plaintiff also refers to CS1 Echols, but he has not named CS1 Echols as a defendant.  To the extent Plaintiff intended to refer to CS1 Terry Nichols, who he names as a defendant but does not mention in the body of his FAC, his claims against CS1 Nichols would likewise be dismissed.

the treatment or provider of his choice. He may not impede his treatment by refusing to cooperate or to accept treatment and thereafter viably assert liability on the part of his caretakers.").

Plaintiff then asked Lt. Bousfield and other security staff to call EMS, two hours later CS1 Kelly returned and EMS transported Plaintiff to KU Medical Center. Plaintiff was also unhappy with the medical care he received at KU Medical Center. He claims that RN Hurtado was "rude & mean spirited." While this attitude may be unprofessional, it does not rise to the level of a constitutional violation. Plaintiff also takes issue with being left in the ER for forty-five minutes after he was given an IV and an EKG, and a troponin sample was taken. Plaintiff was discharged by KU Medical Center doctors after his troponin level came back at zero. Plaintiff alleges that after he was returned to LCF his troponin tests revealed high levels—the highest he had ever tested—and the only pain medication he was given was Ativan. Plaintiff makes the bald allegation that Defendant Burns was deliberately indifferent, without any factual allegations in support. Plaintiff's claims against RN Victoria, EMT Marla Aguilar, Dr. Bocquin, Lt. Bousfield, CS1 Kelly, RN Hurtado, Dr. Bernath, and KU Medical Center Dr. (fnu) Doe are dismissed. The Court will direct LCF officials to include in the *Martinez* Report the failure to conduct follow-up testing or medical care after Plaintiff was returned to LCF on December 23, 2020.

Defendants Major Stuart Bailey, SST Pool, UTM Parks, and CSI Wall responded to a call for security on June 27, 2019. Plaintiff alleges that they moved him to a lockbox security cell in the infirmary and ignored Plaintiff's pleas for transfer to an outside medical facility. These defendants were responding to a request for security from medical staff after Plaintiff made angry demands upon the staff. Plaintiff has not shown that these defendants were deliberately indifferent to his medical needs when they were following orders for security from medical staff. These defendants are dismissed for failure to state a claim against them.

Plaintiff alleges that Dr. Herrod reinstated his KOP medications on March 20, 2020 (Doc. 43–3, at 14) and gave permission for Plaintiff to receive morphine and Ativan on July 31, 2020 (Doc. 43–3, at 15). Plaintiff's allegations fail to show that Dr. Herrod was deliberately indifferent to Plaintiff's medical needs. Plaintiff's claims against Dr. Herrod are dismissed.

### C.  Grievance Process

Plaintiff alleges claims based on his dissatisfaction with the grievance process and claims that various defendants failed to properly respond to his grievances. Plaintiff acknowledges that a grievance procedure is in place and that he used it. Plaintiff's claims regarding his grievances relate to his dissatisfaction with responses to his grievances. The Tenth Circuit has held several times that there is no constitutional right to an administrative grievance system. *Gray v. GEO Group, Inc.*, No. 17–6135, 2018 WL 1181098, at *6 (10th Cir. March 6, 2018) (citations omitted); *Von Hallcy v. Clements*, 519 F. App'x 521, 523–24 (10th Cir. 2013); *Boyd v. Werholtz*, 443 F. App'x 331, 332 (10th Cir. 2011); *see also Watson v. Evans*, Case No. 13–cv–3035–EFM, 2014 WL 7246800, at *7 (D. Kan. Dec. 17, 2014) (failure to answer grievances does not violate constitutional rights or prove injury necessary to claim denial of access to courts); *Strope v. Pettis*, No. 03–3383–JAR, 2004 WL 2713084, at *7 (D. Kan. Nov. 23, 2004) (alleged failure to investigate grievances does not amount to a constitutional violation); *Baltoski v. Pretorius*, 291 F. Supp. 2d 807, 811 (N.D. Ind. 2003) (finding that "[t]he right to petition the government for redress of grievances . . . does not guarantee a favorable response, or indeed any response, from state officials").

The Tenth Circuit has repeatedly held that the denial of administrative grievances alone is insufficient to establish personal participation. *See Stewart v. Beach,* 701 F.3d 1322, 1328 (10th Cir. 2012) (stating that '[w]hatever knowledge Roberts may have had when he denied the appeal,

his only involvement was to deny the grievance appeal, which is insufficient for § 1983 liability");

*Larson v. Meek*, 240 F. App'x 777, 780 (10th Cir. 2007) (unpublished) (denial of grievances alone

is insufficient to establish personal participation in the alleged constitutional violations) (citation

omitted).

At the very most, Plaintiff can be said to contend the KDOC Defendants had knowledge

of the alleged constitutional violation through Plaintiff's grievances. This does not demonstrate

more than that these defendants reasonably relied upon the judgment of the prison medical

providers. That is not enough for liability. *See Phillips v. Tiona*, 508 F. App'x 737, 744 (10th Cir.

2013) (unpublished); *Arocho v. Nafziger*, 367 F. App'x 942, 956 (10th Cir. 2010) (unpublished)

(affirming dismissal of claim against warden because reasonable reliance on judgment of medical

professionals "*negates* rather than supports liability") (citations omitted); *see also Jovel v.*

*Berkebile*, Civil Action No. 13-cv-02637, 2015 WL 4538074, *4 (D. Colo. July 28, 2015) (finding

no personal participation by warden and assistant warden who was "over medical" where

plaintiff's attorney wrote to warden, and plaintiff alleged assistant warden was aware of his

medical needs because he filed a grievance, she frequently asked if he was still hurting, and he

wrote to her and urged her to intervene in his case).

Plaintiff's only claims against the following defendants are based on allegations that they

either did not respond to his grievances or failed to investigate his grievances:  Ralk Salke; Lacy

Osmon; Brett Peterson; Chris Ross; Ron Baker; (fnu) Hershberger; Marci Chamidiling; Jeff

Zmuda; Doug Burris; Dan Schnurr; Sammy Cline; (fnu) Moore; and Brandon Walmsley.

Plaintiff's claims against these defendants regarding the grievance process and the failure to

properly respond to grievances are dismissed for failure to state a claim.

### D.  Corizon/Centurion

Plaintiff names Corizon and Centurion as defendants.  These corporations may not be held liable based upon respondeat superior – that is, solely because they employ someone who violated the Constitution.  *See Rascon v. Douglas*, 718 F. App'x 587, 589–90 (10th Cir. 2017) (unpublished); *Spurlock v. Townes*, 661 F. App'x 536, 545 (10th Cir. 2016) (unpublished) (citations omitted).

In the Tenth Circuit, "to hold a corporation liable under § 1983 for employee misconduct, a plaintiff must demonstrate the existence of the same sort of custom or policy that permits imposition of liability against municipalities under *Monell*."  *Wishneski v. Andrade*, 572 F. App'x 563, 567 (10th Cir. 2014) (unpublished) (citations omitted); *see also Wabuyabo v. Correct Care Sols.*, 723 F. App'x 642, 643 (10th Cir.) (unpublished), *cert. denied*, 139 S. Ct. 427 (2018) ("[T]o state a claim against CCS, [Plaintiff] must identify an official policy or custom that led to the alleged constitutional violation.") (citations omitted).

Plaintiff alleges that there was a custom or policy regarding his medical care but fails to allege facts in support.  Plaintiff's allegations show that he received different types of medical care on different dates, at different facilities and/or from different providers.  Nothing suggests any provider was following a custom or policy regarding his medical care.  He claims in certain instances EMS was promptly called and he was taken to the hospital.  In other instances he claims there was a delay or a refusal to take him to the hospital.  He alleges that certain providers at certain facilities gave him morphine, while other providers refused the same.  He claims that his troponin tests were sent to different labs with varying wait times for results.  He claims that his KOP heart medications were allowed by some providers and at some facilities, while other providers or

facilities refused to reinstate them.  Plaintiff has failed to allege the requisite causative custom or policy.  Defendants Corizon and Centurion are dismissed.

### E.  Count III:  Property Claim

Deprivations of property do not deny due process as long as there is an adequate post-deprivation remedy. A due process claim will arise only if there is no such procedure or it is inadequate.  *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *see also Smith v. Colorado Dept. of Corr.*, 23 F.3d 339, 340 (10th Cir. 1994) ("Fourteenth Amendment due process guarantees pertaining to property are satisfied when an adequate, state postdeprivation remedy exists for deprivations occasioned by state employees.").  Kansas prisoners have an adequate state post-deprivation remedy. *See generally, Sawyer v. Green*, 316 F. App'x 715, 717, 2008 WL 2470915, at *2 (10th Cir. 2008) (finding Kansas county prisoner could seek relief in state courts to redress alleged deprivation of property).

The Court also notes that Plaintiff asserted a claim regarding LCF's handling of his property in *Lynn v. Cline*.  The Court found that:

> In his Motion for Temporary Protective Orders, Plaintiff details the facts surrounding his transfer to LCF and the mishandling of his property. These facts are set forth in the Court's June 24, 2019 Order. (Doc. 24, at 2.) Plaintiff claims that LCF staff decided what property pertained to Plaintiff's pending cases and then "dumped a bunch of disarrayed 'legal papers' into a small 'legal box'" and sent them to Plaintiff in segregation. Plaintiff reviewed the property on July 17, 2019, in the presence of LCF staff and "refused to accept" what he saw as a half-full legal box of disarrayed legal papers. (Doc. 26, at 3.) Plaintiff claims that what is left of his property will be destroyed on August 2, 2019, unless it is picked up by an attorney or third party.  *Id.* at 4. Plaintiff states that he has a hearing in his state habeas case on July 25, 2019. *Id.* at 5.
>
> Plaintiff asks this Court to enjoin prison officials from destroying or removing the remainder of his property held at LCF. Plaintiff attaches correspondence dated June 17, 2019, from the LCF Warden's Office stating that his "excess property is being stored in the LCF Property Department" and "[i]f there are specific

documents urgently needed, please discuss this with your Unit Team." *Id*. at 7. Correspondence from the Warden's Office dated July 3, 2019, states that Warden Baker "agreed that you may dispose of your excess property as you stated, to a third party, or to your attorney. You will have 30 days to make arrangements." *Id*. at 8. Correspondence from Warden Baker dated July 15, 2019, states that the decision to allow Plaintiff thirty days to either send his property to his attorney or a third party was at Plaintiff's request and "generous, considering General Order 9,103 clearly states that you have 7 days to be in compliance with a property disposition notice." *Id*. at 12. Plaintiff was taken out of his cell on July 17, 2019, to meet with the Segregation Unit Counselor to examine his box of legal papers, and Plaintiff "again refused to accept these maliciously trashed/disarrayed legal papers dumped into a legal box." *Id*. at 13. In correspondence to staff dated July 17, 2019, Plaintiff claims that the remainder of his property will be taken into his state habeas hearing by his attorney, who represents him in his habeas case and "will be taking on 4 of my Federal Court suits." *Id*. 17.

\* \* \* \*

To the extent Plaintiff complains about the handling of his property at LCF, the Court has previously refused to intervene in the day-to-day prison operations and again denies Plaintiff's requests regarding the return of his property. This Court's previous Order (Doc. 24) provided that:

> Regarding Plaintiff's legal files, the Court's Order (Doc. 19) granting his motion for extension of time stated that: "the Court will not intervene in the day-to-day prison operations involving the transfer of property. If Plaintiff believes his property was mishandled, he must first pursue his claim through the facility's administrative grievance procedures." (Doc. 19, at 1.)

(Doc. 24, at 2.) Plaintiff's attachments reflect that staff are attempting to work with Plaintiff regarding his excess property, by granting his request to have his attorney pick up his files and granting him additional time to do so. Plaintiff has not alleged why his attorney is incapable of picking up his excess property, and in fact Plaintiff's correspondence with prison officials reflects that his attorney is doing just that and presenting the documents to the court in Plaintiff's state habeas case which was scheduled for a hearing on July 25, 2019. Regarding the property Plaintiff is apparently entitled to keep, it appears as though staff has given him the option to go through it on at least two occasions and Plaintiff has "refused to accept" the files.

Furthermore, deprivations of property do not deny due process as long as there is an adequate post-deprivation remedy. A due process claim will arise only if there is no such procedure or it is inadequate. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *see also Smith v. Colorado Dept. of Corr.*, 23 F.3d 339, 340 (10th Cir. 1994) ("Fourteenth Amendment due process guarantees pertaining to property are satisfied when an adequate, state postdeprivation remedy exists for deprivations occasioned by state employees."). Kansas prisoners have an adequate state post-deprivation remedy. *See generally, Sawyer v. Green*, 316 F. App'x 715, 717, 2008 WL 2470915, at *2 (10th Cir. 2008) (finding Kansas county prisoner could seek relief in state courts to redress alleged deprivation of property).

*Lynn v. Cline*, Case No. 19-3003-EFM-KGG (D. Kan. July 26, 2019) (Doc.27, at 2–4).

Plaintiff brings his property claims against the following defendants: (fnu) Thornton; Holly Shaw; (fnu) Gable; Collette Winklebauer[4]; and Sherri Price.  Plaintiff has failed to allege that an adequate post-deprivation remedy was unavailable. Because an adequate, state post-deprivation remedy exists, his property claims against these defendants are dismissed.

Even if these claims were not dismissed, they would not be properly brought in this action because they are unrelated to his medical claims.  *See* Fed. R. Civ. P. 18 and 20.  As set forth below, Plaintiff has been cautioned on multiple occasions regarding the need to comply with Rules 8, 18 and 20, of the Federal Rules of Civil Procedure.

**F.  Count IV:  Investigations by State Boards**

Plaintiff's claims in Count IV of his FAC are dismissed.  Plaintiff names as Defendants: Kansas Governor Laura Kelly; Carol Mooreland, Executive Director of the Kansas State Board of Nursing; Jane Doe (1), Investigator at the Kansas State Board of Nursing; Jane Doe (2), Kansas Assistant Attorney General assigned to the Kansas State Board of Nursing; Jane Doe (3),  Kansas

---

[4] Plaintiff also alleges that Defendant Winklebauer failed to respond to his written complaint regarding his May 25, 2019 medical care.  This likewise fails to state a claim against Defendant Winklebauer as previously noted.

Assistant Attorney General assigned to the Kansas State Board of Nursing; Tucker Poling, Acting Executive Director, Kansas State Board of Healing Arts; and Joseph Crumpton, Investigator, Kansas State Board of Healing Arts.  The Court previously found that Plaintiff failed to mention these defendants, with the exception of Governor Kelly, in the body of his FAC.

Regarding Governor Kelly, Plaintiff mentions that she did not respond to his letter setting forth his complaints about his medical care.  The Court has already found that failure to respond to a grievance does not satisfy personal participation.  Plaintiff also mentions Governor Kelly in Count IV, where he claims his due process and equal protection rights were violated.

Plaintiff alleges due process and equal protection violations regarding his complaints filed with the state boards.  Plaintiff has failed to allege any factual support for these allegations.  A pro se litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based."  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555 (citations omitted).  The complaint's "factual allegations must be enough to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face."  *Id.* at 555, 570.

Governor Kelly also enjoys Eleventh Amendment immunity. *See, e.g., M.B. v. Howard*, Case No. 18-2617-DDC-GEB, 2021 WL 295882, at *1 n.1 (D. Kan. Jan. 28, 2021) (noting that "the court conclude[d] Eleventh Amendment immunity protects Governor Kelly from suit").  The State of Kansas and its agencies are absolutely immune from suits for money damages under the Eleventh Amendment.  The Eleventh Amendment presents a jurisdictional bar to suits against a state and "arms of the state" unless the state waives its immunity.  *Peterson v. Martinez*, 707 F.3d

1197, 1205 (10th Cir. 2013) (quoting *Wagoner Cnty. Rural Water Dist. No. 2 v. Grand River Dam Auth.*, 577 F.3d 1255, 1258 (10th Cir. 2009)).  Therefore, in the absence of some consent, a suit in which an agent or department of the state is named as a defendant is "proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).

The Kansas State Board of Healing Arts ("Board") "is a state agency which shares the state's Eleventh Amendment immunity." *Taliaferro v. Kansas State Bd. of Healing Arts*, No. 89-2545-V, 1991 WL 80140, at *1 (D. Kan. April 5, 1991) (citing *Brennan v. University of Kansas*, 451 F.2d 1287, 1290 (10th Cir. 1971) ("There is no question that a state agency, functioning as an arm, an alter ego of the state, cannot be sued in federal court because of the prohibition of such suits by the Eleventh Amendment"); *Kansas State Board of Healing Arts v. Foote*, 200 Kan. 447, 449, 436 P.2d 828 (1968) ("[T]he board is an administrative body created under the police power of the state"); K.S.A. 65–2801 et seq.).

In *Warner v. Floyd*, the plaintiff made similar complaints that the Board made no finding of wrongdoing after plaintiff submitted complaints to the agencies.  *Warner v. Floyd*, Case No. 16-4143-SAC-KGS, 2016 WL 9274924, at *2 (D. Kan. Dec. 7, 2016).   The Court held that "Eleventh Amendment immunity protects the State of Kansas and its agencies from being sued in federal court not only upon many federal law claims but also upon Kansas Tort Claims Act (KTCA) claims and other state law claims." *Id*. at *1 (citing *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 107 & 121 (1984); *Ndefru v. Kansas State University*, 814 F. Supp. 54, 56 (D. Kan. 1993) (applying Eleventh Amendment bar to KTCA claim); *Richardson-Longmire v. State Adjutant General*, 1999 WL 156168, at *7–8 (D. Kan. 3/8/1999) *aff'd*, 1999 WL 1032975 (10th Cir. 1999) *cert. denied*, 520 U.S. 1266 (2000) (applying bar to state statutory claim)).

The Court further held that under *Ex parte Young*, 209 U.S. 123 (1908), "a plaintiff may bring suit [in federal court] against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief." *Id*. (citing *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) (citation omitted)).   Where the plaintiff in *Warner* alleged in the complaint that KDHE and the State Board of Healing Arts made no finding of wrongdoing after plaintiff submitted complaints to them, the Court held that "[t]hese allegations fail to allege facts showing an ongoing violation of federal law by individual state officers whom [plaintiff] has named as defendants.  Nor has plaintiff requested specific prospective relief in contrast to money damages." *Warner*,  2016 WL 9274924, at *2. The Court dismissed the claims, finding that plaintiff failed to allege that the defendants had waived the Eleventh Amendment immunity defense or consented to suit in the court. *Id*.

The Tenth Circuit has also held that "it is well established that members of administrative boards who perform judicial functions are immune from damages in a 42 U.S.C. § 1983 action when acting in their judicial capacities."  *Vakas v. Rodriguez*, 728 F.2d 1293, 1296 (10th Cir. 1984), *cert. denied* 469 U.S. 981 (1984) (citing *Butz v. Economou*, 438 U.S. 478 (1978)).  "Here, the Board of Healing Arts is specifically delegated such a quasi-judicial role by statute."  *Id*. (citing K.S.A. 65-2801, et seq.).   "[I]nvestigations and decisions whether to commence disciplinary proceedings are within the quasi-judicial jurisdiction of the Board."  *Id*. at 1296–97.  Immunity is absolute unless there is a "clear absence of all jurisdiction."  *Id*. at 1297 (citing *Stump v. Sparkman*, 435 U.S. 349, 357 (1978)).

### G.  KOP Medications

Plaintiff fails to state a claim regarding his KOP heart medications.  Plaintiff's allegations show that his KOP privileges were withdrawn when he threw his KOP cards out of his cell and

onto the floor.  Plaintiff was denied his request to renew his cards on July 4, 2019, and then he met with doctors on July 15, 2019, and his KOP cards were delivered to him within a few hours. Plaintiff does not set forth any instance when he was denied medication from July 4 to July 15, even though he may have lacked the convenience of having his medication KOP during those days.

Plaintiff alleges that when he was transferred to EDCF on September 23, 2019, he was not allowed to have his KOP cards because EDCF does not allow them for segregation prisoners. Plaintiff's KOP heart medications were eventually reinstated and the matter was ultimately resolved.  In *Rodriguez v. Basse*, the court held that plaintiff failed to state an Eighth Amendment violation where plaintiff alleged that the defendant removed plaintiff's KOP privileges as a form of harassment.  *Rodriguez v. Basse*, No. 2:03-CV-0425, 2004 WL 893586, at *2 (N.D. Tex. April 27, 2004).  The court found that removing plaintiff's KOP privileges did "not constitute deliberate indifference to plaintiff's medical needs as plaintiff can still obtain his medication at the pill window along with many other prisoners" and plaintiff did not show that "he has been deprived of his medication or that he has suffered any other harm."  *Id*.

Although Plaintiff points to an incident in 2014 where he was given the wrong medication, he also acknowledges that the person dispensing the medication was fired.  He also submits instances where other inmates were almost given medication intended for a different inmate. Plaintiff has failed to show that the removal of his KOP privileges during certain timeframes constitutes deliberate indifference.  *See Nunes v. Massachusetts Dep't of Corr.*, 766 F.3d 136, 142–43 (1st Cir. 2014) (finding no Eighth Amendment violation based on occasional medical problems arising from facility's policy change removing HIV medications from the KOP program and making them only available through the daily med line.)  Because Plaintiff's only allegations against Defendant Brandy Cobb and Defendant UTS Hurt relate to his claim regarding his KOP

medications, these defendants are dismissed.  Plaintiff also fails to state a claim against Dr. Ellis

Williams regarding his KOP medications and Defendant Williams is dismissed.[5]

### H.  Retaliation and Conspiracy

Plaintiff fails to state a claim of retaliation or conspiracy.  "[I]t is well established that an

act in retaliation for the exercise of a constitutionally protected right is actionable under [42 U.S.C.]

Section 1983 even if the act, when taken for a different reason, would have been proper."  *Smith*

*v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990) (citations omitted).  The Tenth Circuit has held

that:

> Government retaliation against a plaintiff for exercising his or her First Amendment
> rights may be shown by proving the following elements:  (1) that the plaintiff was
> engaged in constitutionally protected activity; (2) that the defendant's actions
> caused the plaintiff to suffer an injury that would chill a person of ordinary firmness
> from continuing to engage in that activity; and (3) that the defendant's adverse
> action was substantially motivated as a response to the plaintiff's exercise of
> constitutionally protected conduct.

*Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).

However, an "inmate claiming retaliation must allege *specific facts* showing retaliation

because of the exercise of the prisoner's constitutional rights."  *Fogle v. Pierson*, 435 F.3d 1252,

1264 (10th Cir. 2006) (quotations and citations omitted).  Thus, for this type of claim, "it is

imperative that plaintiff's pleading be factual and not conclusory.  Mere allegations of

constitutional retaliation will not suffice."  *Frazier v. Dubois*, 922 F.2d 560, 562 n. 1 (10th Cir.

1990).  "To prevail, a prisoner must show that the challenged actions would not have occurred 'but

for' a retaliatory motive."  *Baughman v. Saffle*, 24 F. App'x 845, 848 (10th Cir. 2001) (citing *Smith*

---

[5] Plaintiff also noted that Dr. Williams established his baseline troponin levels in 2018 and 2019, and failed to respond
to Plaintiff's written complaint regarding his May 25, 2019 medical care.  (Doc. 43–3, at 10–11).  These allegations
also fail to state a claim against Dr. Williams.

*v. Maschner*, 899 F.2d 940, 949–50 (10th Cir. 1990); *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998)).

Plaintiff's claims of retaliation are dismissed for failure to allege adequate facts in support of the claims.  Plaintiff's allegations regarding retaliation are generally conclusory, lacking facts to demonstrate any improper retaliatory motive.

Plaintiff's bald allegation of a conspiracy is likewise insufficient to state a claim.  Plaintiff fails to assert factual allegations in support of these claims.  To state a claim for conspiracy, Plaintiff must include in his complaint enough factual allegations to suggest that an agreement was made. *Gee v. Pacheco*, 627 F.3d 1178, 1183 (10th Cir. 2010).  A bare assertion of conspiracy, absent context implying a meeting of the minds, fails to raise a right to relief above the speculative level. *Id.*  Here, Plaintiff provides no factual information whatsoever to demonstrate any type of agreement was made between anyone.  Such conclusory allegations fail to state a plausible claim for relief.

## I.  State Law Claims

Plaintiff alleges in Count II that he has been subjected to criminal mistreatment, obstruction of justice, criminal deprivations of property, and medical malpractice in violation of state laws and in violation of Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. Plaintiff has already alleged an Eighth Amendment violation in Count I.

Plaintiff cites to K.S.A. § 21-5105, which provides that the criminal code "does not bar, suspend or otherwise affect any civil right or remedy, *authorized by law to be enforced in a civil action*, based on conduct which this code makes punishable." K.S.A. § 21-5105 (emphasis added). Plaintiff has cited this section in prior cases and the court has held that his bald citations to statutes do not entitle him to relief, that the court has no authority to construct legal arguments on his

behalf, and that he fails to "quote or summarize any particular provision of a Kansas statute and suggest how his allegations entitle him to relief thereunder." *Lynn v. Peltzer*, Case No. 16-3096-JTM-DJW, 2016 WL 4060272, at *1, n.1 (D. Kan. July 29, 2016).

To the extent Plaintiff claims criminal mistreatment, obstruction of justice and criminal deprivations of property, those claims are dismissed.  Mistreatment of a confined person is not a tort in Kansas.  Rather, it is crime. *See* K.S.A. 21-5416. There is no indication that Kansas courts have found these criminal statutes can be used as the basis for a civil action.  *See Droge v. Rempel*, 180 P.3d 1094, 1097 (Kan. App. 2008) ("'Kansas appellate courts generally will not infer a private cause of action where a statute provides criminal penalties but does not mention civil liability.'") (quoting *Pullen v. West*, 92 P.3d 584, 597 (Kan. 2004)); *see also LeTourneau v. Venture Corp.*, Case No. 15-cv-2629-JAR, 2017 WL 2378331, at *6 (D. Kan. June 1, 2017) ("the Court is unwilling to infer a private cause of action for a statute with solely criminal penalties"); *cf. Sullivan v. Univ. of Kansas Hosp. Auth.*, ___ F. App'x ___, 2021 WL 303142, at *4 (10th Cir. Jan. 29, 2021) (unpublished) ("[T]he statutory provisions outlawing obstruction of justice do not provide a private cause of action.") (citation omitted).  The Kansas statutes for obstruction of justice and criminal deprivation of property are criminal statutes that do not mention civil liability.  *See* K.S.A. § 21-5803 (Criminal Deprivation of Property) and K.S.A. § 21-5904 (Interference with Law Enforcement).

Because it is not clear at this stage whether or not Plaintiff has asserted a federal claim that will survive screening, it is premature to address supplemental jurisdiction over any remaining state law claims.  In *Soto-Montes v. Corizon Health, Inc.*, the Court noted that because the Court dismissed all of plaintiff's federal claims, there was a question remaining regarding the appropriateness of asserting supplemental jurisdiction over the state claims, or whether diversity

jurisdiction existed under 28 U.S.C. § 1332(a).  *Soto-Montes v. Corizon Health, Inc.*, Case No. 16-3052-JAR-GEB, 2018 WL 1083260, at *2 (D. Kan. Feb. 28, 2018).  The Court noted that although Corizon was an out-of-state corporation, the remaining individual defendants appeared to be Kansas physicians.  *Id.*  The Court found that "[a]lthough Plaintiff is currently incarcerated in the state of Kansas—which, on its face, may appear to destroy diversity—case law indicates a prisoner's domicile for purposes of the diversity statute is the domicile he had prior to incarceration."  *Id.* (citations omitted).  The Court will address supplemental jurisdiction after screening the FAC following submission of the *Martinez* Report.

### J.  Requests for Relief

#### 1.  Relief from Filing Restrictions

Plaintiff asks the undersigned to relieve him from the filing restrictions imposed on him in *Lynn v. Lundry*, Case No. 20-3116-EFM.  The Court notes that although the filing restrictions are applicable to all Plaintiff's cases pending or initiated in the U.S. District Court for the District of Kansas, the filing restrictions were imposed on Plaintiff in another case and by another judge.  Plaintiff appealed that decision, and the Tenth Circuit Court of Appeals dismissed the appeal on November 18, 2020 for failure to prosecute.  *Id.* at Doc. 36.  Therefore, the filing restrictions have not been set aside or modified and are currently in place.  The undersigned declines to modify the order entered by Judge Melgren.  *See  Lynn v. Goddard*, No. 16-3048-SAC (D. Kan. April 5, 2016) (Doc. 21) (an unassigned judge declined to take action in the case, finding that "Plaintiff seeks an improper intrusion into the administration of an action pending before another judicial officer."); *see also Lynn v. Cline*, Case No. 19-3003-EFM-KGG (D. Kan. June 16, 2020) (Doc. 79, at 4–5) ("In fact, much of Plaintiff's motion is in effect his objection to the order for filing restrictions in Case No. 20-3116.  Those arguments can be taken up in that case, as Plaintiff was given an

opportunity to show cause why the filing restrictions should not be imposed.").

## 2.  Referrals to the U.S. Attorney and the grand jury

Plaintiff also seeks "referrals to US Atty. for investigation & prosecution; referral to federal grand jury per 18 USC § 3332(a) re 18 USC §§ 241, 242, 371 violations."  Plaintiff has raised similar requests in prior cases and has been informed that he is not entitled to this relief.  In *Lynn v. Cline*, the Court held that:

> Plaintiff's request for relief includes "referral to Federal Grand Jury for Federal criminal law violations as provided by 18 U.S.C. § 3332(a)."  In his supplemental complaint he seeks "an immediate order compelling the Kansas U.S. Attorney to present Plaintiff and other victims before a Grand Jury under 18 U.S.C. § 3332(a).
>
> Section 3332 does not create a private right of action.  Private rights of action to enforce federal law must be created by Congress, and courts look to whether the text of the statute itself clearly "display[s] congressional intent to create new rights." *Morales v. U.S. Dist. Court for Southern Dist. of Florida*, 580 F. App'x 881, 886 (11th Cir. 2014) (citing *Alexander v. Sandoval*, 532 U.S. 275, 286, 289 (2001)).  "And Congress must 'display[ ] an intent to create not just a private right but also a private remedy." *Id*. (citing *Alexander*, 532 U.S. at 286).
>
> The court in *Morales* held that there is no "rights-creating" language in § 3332(a), and even if the language "arguably implies some potential duty owed on the part of the U.S. Attorney to present information to a special grand jury, that is not a duty owed to Morales individually."  *Id*. (citing *Alexander*, 532 U.S. at 289) ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons."); *see also Hantzis v. Grantland,* 772 F.Supp.2d 1, 3 (D. D.C. 2009) ("no private right of action is available" under § 3332(a)); *Lundy v. United States,* No. 07–1008, 2007 WL 4556702, at *2 (C.D. Ill. Dec. 21, 2007), *corrected on other grounds,* No. 07–1008, 2008 WL 2510172 (C.D. Ill. June 19, 2008) ("§ 3332(a) does not confer a private right of action"); *Bryant v. Fienberg,* No. 206–CV–13849, 2006 WL 2924744, at *2 (E.D. Mich. Oct. 10, 2006) (the "plaintiff does not have a private cause of action under 18 U.S.C. § 3332(a), the Special Grand Jury statute"); *see also Walters v. Vallani,* No. 2:09-CV-00505-KJD-GWF, 2010 WL 597086, at *7 (D. Nev. Feb.16, 2010) (decision regarding what charge to file or bring before a grand jury

> is that of the prosecutor, not the court); *Arnett v. Unknown*, No. CV 11-5896-JAK(E), 2011 WL 4346329, at *6 (C.D. Cal. Aug. 23, 2011) ("Section 3332(a) contains no "clear and unambiguous" statement conferring a private right of action on an individual to present evidence to a special grand jury or to compel a United States Attorney to do so").

*Lynn v. Cline*, Case No. 19-3003-CM (D. Kan. May 7, 2019) (Doc. 15, at 13–14).

In a subsequent order in the *Cline* case, the Court held that "[t]his Court cannot order the initiation of criminal charges, which is a decision within the discretion of prosecuting attorneys." *Id.* at Doc. 24, at 3 (citing *see Presley v. Presley*, 102 F. App'x 636, 636–37 (10th Cir. 2004) (holding that a court order for "investigation and prosecution of various people for various crimes" would "improperly intrude upon the separation of powers")).

### 3. Appointment of Counsel

Plaintiff seeks to have counsel appointed "for all phases of litigating this case."  There is no constitutional right to appointment of counsel in a civil case.  *Durre v. Dempsey*, 869 F.2d 543, 547 (10th Cir. 1989); *Carper v. DeLand*, 54 F.3d 613, 616 (10th Cir. 1995).  The decision whether to appoint counsel in a civil matter lies in the discretion of the district court.  *Williams v. Meese*, 926 F.2d 994, 996 (10th Cir. 1991).  "The burden is on the applicant to convince the court that there is sufficient merit to his claim to warrant the appointment of counsel."  *Steffey v. Orman*, 461 F.3d 1218, 1223 (10th Cir. 2006) (quoting *Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1115 (10th Cir. 2004)).  It is not enough "that having counsel appointed would have assisted [the prisoner] in presenting his strongest possible case, [as] the same could be said in any case."  *Steffey*, 461 F.3d at 1223 (quoting *Rucks v. Boergermann*, 57 F.3d 978, 979 (10th Cir. 1995)).

In deciding whether to appoint counsel, courts must evaluate "the merits of a prisoner's claims, the nature and complexity of the factual and legal issues, and the prisoner's ability to investigate the facts and present his claims."  *Hill*, 393 F.3d at 1115 (citing *Rucks*, 57 F.3d at 979).

The Court concludes in this case that (1) it is not clear at this juncture that Plaintiff has asserted a colorable claim against a named defendant; (2) the issues are not complex; and (3) Plaintiff appears capable of adequately presenting facts and arguments.  The Court denies the motion without prejudice to refiling the motion if Plaintiff's claims survive screening.

### 4.  Punitive Damages

Plaintiffs seeks punitive damages, which "are available only for conduct which is 'shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'"  *Searles v. Van Bebber*, 251 F.3d 869, 879 (10th Cir. 2001) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).   Plaintiff presents no plausible basis for a claim of punitive damages because he alleges no facts whatsoever establishing that any defendant acted with a sufficiently culpable state of mind.

### 5.  Attorney's Fees

Plaintiff also seeks attorneys' fees as relief.  However, Plaintiff, as a party proceeding pro se, is not entitled to such relief as he has not incurred such fees. *See Kay v. Ehrler*, 499 U.S. 432, 434 (1991) (holding that a party who proceeds pro se in an action under 42 U.S.C. § 1983 may not recover attorneys' fees); *see also Turman v. Tuttle*, 711 F.2d 148, 149 (10th Cir. 1983) (pro se prisoner prevailing in § 1983 action was not entitled to attorney fees).

## IV.  Amendment

The Court declines to grant Plaintiff another opportunity to amend his complaint.  Plaintiff filed this case on July 2, 2019, alleging that he was in imminent danger of serious physical injury. Despite this allegation, Plaintiff sought multiple extensions of time and stays in this case, and he did not file his complaint on the court-approved form until February 8, 2021.  The alleged incidents in many of the claims in Plaintiff's FAC occurred during the delay between the initiation of this

action and the filing of Plaintiff's FAC.  Plaintiff has a history of initiating actions and utilizing them as a means of seeking relief for daily on-going grievances instead of prosecuting his underlying claims. *See, e.g., Lynn v. McCurrie*, No. 17-3041-JWBKGG (D. Kan.) (filed on March 14, 2017, and dismissed on December 6, 2018, for failure to file a proposed second amended complaint as ordered by the court).

Plaintiff has also been cautioned on multiple occasions regarding the need to comply with Rules 8, 18 and 20, of the Federal Rules of Civil Procedure.  *See, e.g., Lynn v. McCurrie*, Case No. 17-3041-JWB-KGG (D. Kan. June 25, 2018) (Doc. 73, at 3, 6) ("In complete disregard of the court's Order to follow Rules 18 and 20 when filing his amended complaint, Plaintiff's FAC includes multiple unrelated claims and defendants. . . . Plaintiff's FAC also violates Rule 8 of the Federal Rules of Civil Procedure because it is not a short and plain statement of Plaintiff's claim.").

THE COURT THEREFORE ORDERS that Plaintiff's request for appointment of counsel is denied without prejudice.

IT IS FURTHER ORDERED that the Court will not serve the following defendants or require them to answer or otherwise respond to the FAC until the Court has screened Plaintiff's FAC after submission of the *Martinez* Report: Dr. Charlie Willnauer; RN Mary Yoakum; RN Melissa Doe; ARPN Rajwinder Kaur; HSA Aleycia McCullough; RN Michele Layton; RN Janice Gunter; Dr. Barry Lewis-Harris; DON Brian Burns; Debra Lundry; Dr. Monir; RN Duane Denton; RN Bob Pritchard; RN Dickinson; RN Faye Vargas, and Captain Koob. Plaintiff's claims against all other named defendants are dismissed.

IT IS FURTHER ORDERED that the following claims are dismissed:  Plaintiff's claims in Count II for criminal mistreatment, obstruction of justice, and criminal deprivations of property; all of Plaintiff's claims in Count III for violations of his First, Fourth and Fourteenth Amendment

rights, his property claims, retaliation claims, and claims regarding his grievances; and all of Plaintiff's claims in Count IV for due process and equal protection violations, and his conspiracy claims.

IT IS FURTHER ORDERED that:

(1)    Officials responsible for the operation of LCF and HCF are directed to undertake a review of Plaintiff's claims regarding his medical care on May 25, 2019 at LCF; June 26–28, 2019 at LCF; December 30–31, 2019 at HCF; and December 23, 2020 at LCF.  Regarding medical care on these dates, the Report should address:  the failure to provide Plaintiff with pain medication; the delay in receiving troponin test results; and the failure to transport Plaintiff to the hospital in light of elevated troponin test levels.

a.   To ascertain the facts and circumstances;

b.   To consider whether any action can and should be taken by the institution to resolve the subject matter of the claim; and

c.   To determine whether other like complaints, whether pending in this Court or elsewhere, are related to this claim and should be considered together.

(2)    Upon completion of the review, a written report shall be compiled which shall be filed with the Court and served on Plaintiff.  The report shall be filed within **sixty (60) days** of the date of this Memorandum and Order.  The KDOC must seek leave of the Court if it wishes to file certain exhibits or portions of the report under seal or without service on Plaintiff.  Statements of all witnesses shall be in affidavit form.  Copies of pertinent rules, regulations, official documents, and, wherever appropriate, the reports of medical or psychiatric examinations shall be included in

the written report.  Any recordings related to Plaintiff's claims shall also be included.

(3)     Authorization is granted to the officials of LCF and HCF to interview all witnesses having knowledge of the facts, including Plaintiff.

(4)     No answer or motion addressed to the FAC shall be filed until the *Martinez* Report required herein has been prepared and filed.

(5)     Discovery by Plaintiff shall not commence until Plaintiff has received and reviewed Defendant's answer or response to the FAC and the report ordered herein.  This action is exempted from the requirements imposed under Fed. R. Civ. P. 26(a) and 26(f).

IT IS FURTHER ORDERED that the Clerk of Court shall enter KDOC as an interested party on the docket for the limited purpose of preparing the *Martinez* Report ordered herein.  Upon the filing of that report, KDOC may move for termination from this action.

Copies of this order shall be transmitted to Plaintiff and to the Attorney General for the State of Kansas.

IT IS SO ORDERED.

Dated: April 13, 2021                          /s/ *Holly L. Teeter*
                                               HOLLY L. TEETER
                                               UNITED STATES DISTRICT JUDGE