*APRN Baynham*
*Doc. 69/Ex. #11*

*Filed 5-29-20*
*w/ Martinez Rpt*
*in Cline suit*

*Rote BS*

*Exhibit A*

Horn Aylward & Bandy, LLC
2600 Grand Boulevard, Suite 1100
Kansas City, Missouri   64108
Telephone: (816) 421-0700
Fax: (816) 421-0899

IN THE UNITED STATES DISTRTICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| PATRICK C. LYNN, | ) | |
| Plaintiff, | ) | |
| v. | ) | CASE NO. 19-3003-EFM |
| SAMMY CLINE, et al. | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF CARMEN G. BAYNHAM, APRN

Pursuant to 28 U.S.C. § 1746, **CARMEN G. BAYNHAM** states under oath as follows:

1. I am over eighteen (18) years of age, suffer from no impairment, and am otherwise legally competent to make this Affidavit.

2. My name is Carmen G. Baynham. The matters stated in this Affidavit are based on my personal knowledge and my review of the medical records of inmate Patrick C. Lynn ("Mr. Lynn") as maintained by Corizon LLC ("Corizon") and the Kansas Department of Corrections ("KDOC").

3. I am familiar with the retention of medical records by Corizon and the KDOC. The case file, records and notes for Mr. Lynn contain opinions, acts, and events made at or near the time of entry by a person with knowledge and are made and kept during a regularly conducted business activity by Corizon and the KDOC. These records were made in the ordinary course of the provision of health care services to inmates in custody. It is a regular

**EXHIBIT  11**

*66*

business activity of Corizon and the KDOC to make and keep such records. I am relying on my personal recollection and the information contained in the Mr. Lynn's case file, records, and notes in accordance with standard medical health professional practice. I have given any opinions stated herein within a reasonable degree of certainty.

4. I am an advanced practice registered nurse ("APRN")  and have been employed by Corizon, LLC at Hutchinson Correctional Facility ("HCF") since about May 2018. I have undergraduate nursing degree and a graduate degree in advanced practice nursing. Prior to working at HCF, I worked for a year as an APRN with a cardiologist in Wichita, KS. The practice largely consisted of interventional cardiology care with treatment of patients at several hospitals in the region. I regularly worked rounds at a medical center on the cardiologist's behalf and was often consulted by the hospital staff regarding cardiology matters.

5. I understand that Mr. Lynn has recently made several claims against certain HCF correctional, behavioral and medical staff for events that occurred on January 23, 2019 and January 24, 2019.

6. Mr. Lynn is a 62-year-old male with a history of severe coronary artery disease, chronic angina (chest pain) and chronically elevated troponin levels. Per his medical records, he had a quadruple bypass (CABG) in July 2014 and was later admitted on or around June 24, 2018 for chest pain and subsequently diagnosed with a non-ST-elevation myocardial infarction. He has been prescribed a variety of medication to manage his heart condition and chronic angina including but not limited to ranolazine (for chronic angina), aspirin (blood thinner), atorvastatin (cholesterol medication), isosorbide mononitrate (dilates

blood vessels), metoprolol (a beta blocker for hypertension), and nitroglycerin (a vasodilator for acute chest pain).

7.  Prior to Mr. Lynn's transfer to HCF on Wednesday, January 23, 2019, I participated in a multidisciplinary team meeting where we discussed the anticipated arrival of Mr. Lynn. Mr. Lynn was transferred from Lansing Correctional Facility (LCF). Dr. Monir had reviewed Mr. Lynn's medical record and been apprised of the medical plan of care developed by the health care providers at LCF to provide medical care for Mr. Lynn in relation to his diagnoses of severe coronary artery disease, chronic angina and chronically elevated troponin levels. A review of his medical records while at LCF between May 23 and June 24, 2019 revealed multiple medical clinic visits for complaint of chest pain with transfers to the hospital. An administrative note entered by a physician at Lansing on June 27, 2019 noted that hospital physicians recorded Mr. Lynn may have normally high troponin levels, chest pain may be more related to irritation from prior CABG as there was no evidence of demand ischemia (lack of oxygen to the heart related to exertion). Troponin refers to a group of proteins that help regulate contractions of the heart and skeletal muscles. A normal range for this protein is below 0.055 ng/ml and a probable heart attack is above 0.056 ng/ml. Mr. Lynn was prescribed medication to help reduce his chronic angina symptoms but Mr. Lynn often refused to take his prescribed medication. The health care team at LCF had adopted a plan of care for Mr. Lynn when he complained of increased chest pain that included drawing a troponin level. It was my understanding from the meeting that Mr. Lynn had been incarcerated with the KDOC for an extensive period of time and was well known at HCF and other KDOC facilities. Mr. Lynn is further known as a challenging patient from both a behavioral and medical perspective as it is often

Page 3 of 6

difficult to ascertain if his complaints are legitimate or if he is using his condition to manipulate others. For example, and for explanatory purposes only, I recall that Mr. Lynn started complaining of chest pains several days after the events at issue on January 24, 2019 and I arranged to have him brought to an exam room. While in the exam room, Mr. Lynn exhibited no symptoms of chest pain, did not appear to be in distress and was talking with ease to the correctional staff. During my examination, it became apparent to me that Mr. Lynn was only claiming chest pain because he wanted to leave his cell to talk to the officer in charge. A review of Mr Lynn's LCF medical record revealed a pattern of this behavior in which he complained of chest pain in order to pursue his own agenda. During the multidisciplinary team meeting mentioned above, it was ultimately determined that we would test Mr. Lynn's troponin levels if he complained of increased chest pain. If Mr. Lynn's troponin levels came back elevated, the plan was that we would emergently transfer him to a hospital.

8.   On Thursday, January 24, 2019, Mr. Lynn was brought to the main clinic following an initial consultation with the nurse on staff in the restrictive housing unit. A true and correct copy of the pertinent portions of Mr. Lynn's KDOC medical records for January 24, 2019 is attached to this Affidavit as "Exhibit A." Although the time listed in the record is 4:40 p.m., that is actually the time that I opened the record in the system to enter the progress note. I estimate that I actually first saw Mr. Lynn around 3:50 p.m. At that time, Mr. Lynn was completely focused on the pain in his chest, his blood pressure was elevated and he was sweating heavily. In my personal judgment, these symptoms indicated a valid cardiovascular issue.

*[Handwritten margin notes: "Cite date & compare to my claim on her #RN Helus", "produce it", "yes", "YES", "who changed that? What happened on 12-30-3-19", "Bingo", "FOCUS", "Page 4 of 6", "69"]*

9.  Pursuant to the prior understanding from the multidisciplinary meeting, I tested Mr. Lynn's troponin levels. At approximately 5:00 p.m., his troponin levels came back elevated at 0.132 ng/ml. (*See* Exhibit A at p. 7.) As a result, Mr. Lynn was promptly prepared for and taken to the Hutchinson Regional Medical Center ("HRMC") via EMS transport at approximately 5:35 p.m. (*See* Exhibit A at p. 11.)

10. In addition to signs such as chest pain, there are multiple factors to diagnose a heart attack. One is the troponin blood test referenced above. Another is by looking at an EKG tracing of the heart rhythm which can help a cardiologist potentially determine the area of the heart muscle involved.   Providers at HRMC diagnosed Mr. Lynn with a non-ST-elevation myocardial infarction ("NSTEMI").   A true and correct copy of the pertinent portions of Mr. Lynn's HRMC medical records is attached to this Affidavit as "Exhibit B." Notably, the physicians did not immediately perform a cardiac catheterization on Mr. Lynn on the day of admission to the hospital, indicating that most likely they were not concerned that his NSTEMI was the result of a coronary artery blockage. Indeed, Mr. Lynn's physicians ultimately conducted a cardiac catheterization the next day, January 25, 2019, which confirmed there were no arterial blockages.

*[Handwritten annotations:]* Focus · Yes · Then why did HRMC Dr. Mattar scedule me for Aortic Bypass & 2 other major operations for 3wks. plus later?



Page 5 of 6

70

The above statements are true and based upon my personal knowledge and expertise to which I am competent to testify at trial. I declare, certify, verify and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

FURTHER AFFIANT SAYETH NOT.

5-14-20
(Date)

CARMEN BAYNHAM, APRN

STATE OF KANSAS              )
                            )  ss:
COUNTY OF RENO              )

BE IT REMEMBERED, that on this 14th day of May, 2020, before me, the undersigned, a Notary Public in and for the county and state aforesaid, came Carmen Baynham, who is personally known to me to be the same person who signed the above document and said person duly acknowledged the execution of the same and swore to the same in my presence.

Notary Public

My Appointment Expires:

NOTARY PUBLIC - State of Kansas
RHONDA K. SEVERIN
My Appt. Exp. 11-18-2022

(NOTARY SEAL)

752016v.1

**United States Courts for the Tenth Circuit**
**Office of the Circuit Executive**
**1823 Stout Street**
**Denver, Colorado 80257**
**(303) 844-2067**

David Tighe
Circuit Executive

Leslee Fathallah
Deputy Circuit Executive

PM
February 15, 2022

*Rec'd Friday*
*2-18-22*

*Exhibits B*
*(14 pgs)*

Mr. Patrick Lynn, #64377
P.O. Box 311
El Dorado, KS 67042

Re:   Patrick Lynn v. District Judge Eric F. Melgren
      Judicial Complaint No. **10-20-90037**

Dear Mr. Lynn:

    We are in request of your request for a status update in the above-referenced
complaint.  Unfortunately, we do not have an update from the Judicial Council on your
matter but as soon as we do, we will send you an order.

                Sincerely,

                *Leslee Fe*

                Leslee Fathallah
                Deputy Circuit Executive

10TH Circuit Judicial Council Panel/Committee;
David Tighe — Circuit ~~Exeative~~;
Leslee Fathllah — Dep." "
1823 Stout St.
Denver, Colo. 80025 →

Exhibit B

Patrick Lynn
64377, EDCF, P.O. Box 34
El Dorado, KS 67042

Re: Additional Relevant & Admissible Judicial Misconduct
    Facts For Consolidation With Complaint No.10-20-9003 →

October 25th 2021

To Those Of You That Believe In Established Law, & Ethics...,
I pray to inculcate you folks w/additional relevant & admissible
facts as regards Judge Melgren's corrupt propensities to perversely
deem hisself unaccountable to established laws, ethics ...
& to any reasonable person w/knowledge of the below facts,
& to any reasonable persons would say as I do, that Melgren
such reasonable corrupt cretin masquerading as a Judge &
is a dispicably corrupt cretin masquerading as a Judge &
declare the system of checks & balances to remedy/intervene
is likewise corrupt & that applies to everyone who knows
the facts/evidence before you & below:

1) While Melgren was the U.S. Atty. of Kansas, he/his subord-
inates prosecuted ~~a~~ massive RICO criminal cases against
alleged gang members of various "sets" & obtained dozens
& dozens of convictions — many of which were the result
of pleadeals to have defendants testify (perjurously) against
others ..., & I recall numerous life sentences & 30 yrs. plus
sentences ...

2) On 4-5-21, a massive class action lawsuit was filed in KS
Fed. Ct. by the KS faction of the ACLU & some enity called the
"KS Appleseed Ctr for Justice", captioned a Progeny, et al v.
City of Wichita, et al., Case No. 6:21-cv-1100-EFM/ADM.
  I was given a courtesy copy by one of the named prisoner
Plaintiff's & upon seeing the "EFM" inttials of who was
presiding, I immediately told him about Melgren's "in your
face conflicts of interest" which mandated he had to →

1 of 2

recuse himself & the "appearance of bias, prejudice, lack of impartiality" was head-swiveling OMG obvious & Melgren himself knew this — just like in what he did to me in my Lundry & Cline 55 1983 suits.  My friend / a named Plaintiff was stunned & agreed & opined "this case is doomed from the start w/that evil pig presiding"...

I wrote to Teresa Woody to inculcate herself & the ACLU about Melgren's "in-your-face" odious conflicts of interest & its palpable & irreconcilable. That was a few months ago.  Every ruling that "evil pig Melgren" issued is truly corruptly tainted.  Everybody w/knowledge of the Fed. RICO prosecutions & pompous press conferences Melgren had during & after those cases, openly say OMG how can he preside over that suit after what he did in the same city against the same gangs while a Prosecutor in the same Fed. Cause.!

I respectfully pray you folks to hold this cretin accountable — he never deserved to be appt'd to a lifetime Fed. Ct. Judgeship.  Having his face glued to Sammy Brownback's buttcheeks for decades only makes him qualified to be an "ass-wiper."  Crude but true.

You folks cannot stay blind to the corrupt pomposity in this dispicable cretin & move to disrobe / disbar him.

Sincerely,

Patrick Byrnes

CC: Eric Melgren / "Judge";
Julie Robinson / "Chief Judge";
Teresa Woody / KACJ Litigation Director;
Sharon Brett / KS ACLU Legal Director;
Evidence Files.

2062

David Tighe - Circuit Executive;
Leslee Fathallah - Deputy Circuit Executive,
1823 Stout St,
Denver, Colo. 80257

Patrick Lynn
64377, EDCF, P.O. Box 311
El Dorado, KS 67042

Re   Supplemental Facts Relevant To Review By The Judicial
     Council — Judicial Complaint No. 10-20-90037

October 11th, 2021


I respectfully submit the following spot-on facts relevant to my
5-10-21 appeal to the Judicial Council as regards my legitimate
Judicial Misconduct Complaint No. 10-20-90037;

1) I was reviewing the local rules of the KS U.S. District Courts
& took special notice of Rule 83.6.1 re Professional Responsibility,
at subsection "(a) Kansas Rules, stating:
       "The KS Rules of Professional Responsibility as adopted &
       amended by the Supreme Court of Kansas are adopted by this
       Court as the applicable standards of professional conduct,
       except as otherwise provided by a specific rule of this
       Court."

And at Rule 83.6.12 re general Provisions, at subsection (b),
stating; "Statute of Limitations, No statute of limitations
bars any proceeding under these disciplinary rules,"

And of critical importance then is the KS Supreme Court
Rules of Professional Conduct, S. Ct, Rule 226, & specifically
KRPC 8.2, Judicial & Legal Officials, stating:
" (a) A lawyer shall not make a statement that the lawyer
       knows to be false or w/reckless disregard as to its truth
       or falsity,
  (b) A lawyer who is a candidate for judicial ofc, shall comply
       w/the applicable provisions of the Code of Judicial conduct"
& See also on point, the "Comment" section at "[1]" states:

1 of 8

"Assessments by lawyers are relied on in evaluating the professional or personal fitness of persons being considered for election or appointment to judicial ofc. & to public legal offices..."

And the "Comment" Section at "[2]" states unambiguously: "When a lawyer seeks judicial ofc, the lawyer should be bound by applicable limitations on political activity"

2.) I again implore the Council to focus on the concrete facts about this Melgren character that I have repeatedly protested, established an intolerable risk of bias... & that while Melgren was rewarded w/a secret agreement between him & Sammy Brownback (former KS U.S. Rep, U.S. Senator, governor, & other political ofcs. — that Melgren was campaign chairperson of each) to be the appointed KS U.S. Atty, I & my family sent him multiple letters seeking federal criminal investigations of the concrete facts & evidence of federal criminal statutes by then JoCoKS D.A. Paul Morrison, & by KDOC staff against me, he corruptly ignored us & the concrete facts & evidence, & that Melgren resigned his position in 2008 due to yet another secret agreement between him & his master Sammy Brownback, in which Melgren was promised the next open KS federal Judgeship (& he was in fact nominated in 2008 & Brownback played puppetmaster pulling the strings amongst his political ofc. holder veterans in congress to ensure Melgren's confirmation & he was sworn in during late 2008 I recall, & the fact remains that while Melgren was between being KS U.S. Atty, & while awaiting his confirmation as KS U.S. D.Ct Judge, (he) held a press conference on the Cthse. steps or in front of City Hall Bldg. in Wichita w/several "prominent LEO/Public officials to endorse Paul Morrison's campaign for KS State Atty. General. Melgren was the spokesperson, & the irony was that Morrison had been a staunch Republican for 30 yrs. & elected as JoCoKS D.A. as a republican (& I'm told w/funds contributed by the KS Republican Party Chrmn. Melgren) & was "wined & dined" by then gov. Sebelius & Lt. Gov. Mark Parkinson (he was Morrison's atty in a KS Fed.Ct. sexual harassment suit 25 yrs. earlier by a former—

2 of 8

asst. JoCoKS D.A. subordinate, & she later said she dropped the suit because she was put in fear or her safety & having any career as a lawyer if she didn't drop the suit because Morrison was extremely powerful in the LEO community of KS) to change his political stripes & run as a Democrat against the incumbent Republican KS state A/g Phill Kline (since dis-barred). And to have the former KS Statewide Republi-can Party Chairperson Melgren endorsing a traitor-turned Democrat Morrison was ginormous news at the time & after Melgren was sworn in as a KS fed. Ct Judge in 2008, Morrison was sworn in as the newly elected KS State A/g in January 2009 & he then imploded when the Topeka Capitol Journal newspaper unmasked Morrison as a scandalous sexual predator on 12-9-09 in a 2-3 pages humongous story that exposed Morrison's numerous criminal acts under both state & federal criminal statutes & Morrison resigned on Friday/ 12-14-09 saying he "was going to try getting right w/God & his family" & his former asst. in the JoCoKS D.A. ofc. declared in her sworn deposition that Morrison took her across state lines to NYC for a nat-ional D.A. convention, got her drunk & raped her in her hotel room, then made over 400 threatening & blackmail phone calls to her/ Linda Carter (her deposition was corruptly sealed by Morrison's corrupt judicial cohorts in JoCoKS) & then another 30-35 women in the JoCoKS legal community came forward & made similar claims of perverse criminal acts by Morrison against them — & Morrison's corrupt cronies "circled their wagons" around Morrison to not only protect him from any State/ federal criminal prosecutions, but also to protect his law license & he never even got so much as a public censure much less suspension or disbarment, & all reasonably intelli-gent persons in KS & elsewhere, know & adamantly believe that Melgren pulled in more than a few favors to secretly protect the corruptly pervert cretin he publically endorsed to be KS State A/g.

3) I also personally watched that 2008 local Wichita TV-news segment of Melgren's press conference endorsement of Morrison & having watched such, got the "answers"

3 of 8

of why Melgren & his subordinates in the KS U.S. Atty's
Ofc. repeatedly ignored the stunning concrete facts & evidence
of what Morrison did to railroad a provably innocent
me in JoCoKS D.Ct. Case #16-CR-1654, & why Melgren
& his subordinates repeatedly ignored the awful facts & evi-
dences of hideously criminal abuses by KDOC officials
against me & countless others.   Melgren has no integrity.

This Judicial Review Council must keep in mind that this
Melgren character has repeatedly denied he ever held a press
conference to publically endorse Morrison for KS A/G in 2008
& he has deceitfully twisted/distorted my truths & claimed
he never publically endorsed Morrison for statewide ofc.
while KS U.S. Atty. or while as a KS Fed. Ct. Judge & that
was not the claim that solidifies my claims that a bona-
fide conflict of interest exists that he can no more preside
over any case involving his corrupt crony Morrison than he
can preside over any case I have against corrupt prison
officials because he gave monsterously evil prison officials
free reign to horribly inflict excessive acts of physical
brutalities & cruel conditions of confinement, retaliations
for exercising 1st Amendment rights, writing perjurous "CVAU
rules violations, & denying medical care in midst of life—
threatening calamities & even maliciously causing death.
4.) Never once has any state or federal LEO brought any
criminal case against a KDOC official for violating any
state or federal law & rights of a KDOC prisoner in the
2/5 plus yrs. I've been wrongfully imprisoned & this Judicial
Review panel council isn't so preposterously naive to
say, think, believe these atrocities haven't happened or
still happening.
5.) My formal motion for change of Judge & my Affidavit of
Prejudice were filed in Lynn v. Lundry/KS D.Ct C/A#20-cv-
3116 [10th Cir. #20-3138 & now pending as SCOTUS Case No. 21-
5296 ] & simultaneously in this case in the KS D.Ct.; &
I bid this council to recognize Melgren's filing restric-
tions injunction threats & actual injunction was also
both filed simultaneously in both cases. See again →

my motion's per 28 USC §§ 144 & §§ 144.

6.) According to the KS Fed. Ct.'s Local Rules & the KS S. Ct. Rule 226 /KRPC 8.2 (a) &(b) /Comment Section [1] &[2], & KRPC 8.3(b)/Comment [1], & KRPC 8.4 (a)-(g)/Comment Section [1], [2], &[4], it is abundantly clear & easily verified by this Judicial Council, that while Melgren was nominated for the open federal court Judgment in Wichita & awaiting confirmation, he was publically endorsing Paul Morrison w/a press conference to be KS State A/G & he didn't do that for anybody else at the time ——— that activity is plainly in contravention of Local Fed. Ct. & KS S.Ct. KRPC rules.

And per Berger v. U.S., 255 U.S. 22 (1921), which holds that "It is well-established that when presented w/an affidavit of prejudice, the Judge may not pass upon the truth or falsity contained therein, but must accept them as true for the purposes of passing upon the legal sufficiency of the affidavit."

In my cases, Melgren corruptly acted as Judge & Jury on his own factually true misconduct against me while he was the KS U.S. Atty. before he left that position in 2008 & was the KS U.S. Atty. many years prior to 2008.

In Aetna v. Lavoie, 475 U.S. 813, 820-21 (1986) the Court held: "Most questions concerning a Judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the 14th Amendment establishes a constitutional floor, not a uniform Std. & instead these questions are, in most cases, answered by common law, statute, or the professional Stds. of the bench & bar.

A defendant (Plaintiff/Appellant) need not prove actual bias to establish a due process violation, just an intolerable risk of bias.

I passionately contend that the facts/evidence presented in motion for change of Judge & more fully in my affidavit of prejudice filed in Lundry & Cline, at a minimum, give rise to an intolerable risk of bias from Melgren based on his repeated→

5 of 8

conscious refusals to act in any regard to uphold & enforce my state/federal rights violated by Morrison, & violated by KDOC officials w/arrogant impunity & which compounded those horrible atrocities & consciously denied me equal protection of the law & gives rise to Melgren sanctioning such atrocities of state & federal laws & that he can never be impartial in any case involving me & JOCOKS officials involved in my wrongful convictions, & likewise, he can never be fair & impartial in any case involving me or any other KDOC prisoner suing KDOC & state officials.

And these abominations are exponentially compounded & the likelihood of bias is convincing by virtue of not only Melgren retaliating against me for questioning his clear & convincing conflicts of interests & suggesting his recusal & he then imposes an overkill filing restrictions injunction on me that I can never meet (nor would any atty. be willing to represent me under such arduous bs conditions), & after I formally seek his recusal & file my affidavit of prejudice, he determines the merit of such in blatantly arrogant contempt of his statutory duty to refer my Affidavit of prejudice to a conflict free Judge to determine & that alone by itself demonstrates he is in fact, not impartial & deems hisself above the rule of law, See also Exhibits #B & C herewith.

7.) To date, easily 100 legitimate pleadings have been denied filing in Lundry, Cline, & ongoing in Lynn v. Willnaver, KS Fed. #19-CV-3117-HLT (See also 10th Cir. 8-12-20 ruling in Case #19-3166/#19-3185) & I am extremely prejudiced & distressed so severely that these profound court access denials dramatically affect my physical & psychological health as he perversely intended to begin with.

In sum & substance, you must hold him accountable, & I pray you folks to simply contact the Wichita, KS area TV stations to obtain that 2008 news segment of Melgren's press conference w/other LEO's, to endorse the notoriously corrupt Paul Morrison, & simply read the 12-9-09 Topeka Capitol Journal 2 pg. plus exposé on Morrison that led to his resignation implosion.   6 of 8

I thank you folks in advance for your integrity to investigate the truth of my protests & Melgren's corrupt denials & audacity to ridicule me in the face of his violations of KRPC rules, Judicial Canons, & statutory violations of 28 USC § 144,

Sincerely,

Patrick Lynn

cc:

Melgren; Teeter;
Chief Judge Tymkovich,
Evidence File

8.) Statutory interpretation of 28 USC § 144 explicitly states "...such judge <u>shall</u> proceed no further therein, but another judge <u>shall</u> be assigned to to hear such proceeding," & mandates a commonsense compliance & the himalayan mountain of actual harm/devastating injuries suffered as a direct & proximate result of Melgren's criminal abuses of authority violating my 1ST Am. rights to court access to petition for redress of actionable wrongs & his rabid intentional denials of my 14th Am. rights to due process & the equal protection of the law in the face of the cold hard facts/evidence requiring his recusal & the intolerable risk of his his bias, causes any reasonable citizen w/knowledge of the truths <u>I declared under penalty of perjury</u>, to allege & believe that this Melgren character & others criminally conspired to obstruct justice against me in violation of 18 USC §§§ 241, 242, 371...

28 USC § 144 establishes a bright line rule: "such judge <u>shall proceed no further therein</u>; & "another judge <u>shall</u> be assigned to hear such proceeding. Melgren refused to allow 100 plus pro se motions to be filed in <u>Lundry</u>/D.Ct.# 20-cv-3116 & <u>Cline</u>/D.Ct.# 19-cv-3003, & his corrupt proxy & co-conspirator/D.Ct. Judge Holly Teeter has likewise refused to allow dozens & dozens of pro se motions →

7 of 8

to be filed in Willnauer / D. Ct. # 19-CV-3117, & butchered my act-
ionable claims the 10th Cir. remanded upon in Case # 19-3185/
see 8-12-20 ruling.



Exhibit B

**TO:**       Patrick C. Lynn, #64377
Hutchinson Correctional Facility
PO Box 1568
Hutchinson, KS 67504

**FROM:**    United States District Court
444 SE Quincy Street
490 US Courthouse
Topeka, KS  66683

**DATE:**    May 27, 2020

**SUBJECT:**  Written Correspondence

The clerk's office is in receipt of your written correspondence dated May 22, 2020, a copy of which is included with this memorandum.  Pursuant to your request, current docket sheets were mailed to you with regard to Case Nos. 19-3003 and 20-3116.  Information regarding a Judicial Misconduct Complaint was also sent to you.

With regard to Judge Murguia, he left the bench this spring and all cases assigned to him were reassigned to other judges.  With regard to Judge Melgren, he left the U.S. Attorney's Office in October 2008 when he became a Federal Judge.

This fact thus means Melgren WAS the KS U.S. Atty,
when he & the other Wichita LEO's (D.A., Police Chief & Sheriff...)
held press conference on C+hse, steps to endorse the renowned
corrupt evil pig Paul Morrison's canidacy for KS state A/g &
(I) saw it that summer/or possibly in Sept. of 2008.
Declared under penalty of perjury per 28 USC §§ 1746.
Executed on 4-8-22.
S/ Patrick Lynn

STATE OF KANSAS

COUNTY OF BUTLER

Exhibit C

AFFIDAVIT OF: Mark Fraley, #56370

WHEREAS, Pursuant to 28 USC § 1746 AND K.S.A. § 53-601(a)(2), I, Mark Fraley, KDOC #56370, herewith declare upon my solemn oath & under penalty of perjury per (18 USC § 1621 AND K.S.A. § 21-5903, Respectively) that the following facts are true and correct in both substance & fact, based on my own personal experience, SO HELP ME GOD;

1). WHEREAS, At all times material & relevant herein, I am a KDOC prisoner currently located at E.D.C.F. & confined in L2-#232, AND I take daily medication Three times a day in which a medical technician OR Nurse's come into the L-1 side to distribute inmate meds where the procedure is that we stand in line with a cup of water for the med-tech/Nurse to dump what ever they have previously put into a small envelope (we inmates do Not see the blister pac which has the listed medication in), so we take what they tell us is our medication. In short, we must be on our (A-GAME) OR take a leap of faith that what they put in our cup of water is actually our properly ordered medications from seeing a licensed Doctor being correctly distributed;

2). WHEREAS, On or about 8/24/2020, RN Delpergang - Director of Nursing for EDCF contract provider of Medical Services "CENTURION", was herself acting as the Med-Tech distributing medications, as I awaited my turn in line w/my cup of water she looked directly into my face and dumped an envelope with a medication that floated on top of the water & I knew it wasn't mine. I asked her if she just put another inmates medication into my cup, and looking down I immediately saw the empty envelope of Mr. Pat Lynn that Ms. Delpergang had just put down, she did appologize and told me that I could write her up;

3). WHEREAS, I, Mark Fraley, thereafter told Pat Lynn, #64377 about the error by RN Delpergang & he requested I provide him with this Affidavit and I agreed to do so. On & about this incident, it seems as if it is a routine travesty which happens quite often which puts inmate/prisoner population on medications Not ordered by a Dr. & this current practice puts prisoners future Health & Safety at great risk;

4). WHEREAS, Further affiant sayeth naught at this time.

Executed on 9-21-20
at EDCF, P.O. Box 311, El Dorado, KS. 67042.

Mark Fraley

*Cline was HCF Warden at time.*

May 2019 PLN

# Kansas Federal Court Awards Prisoner $250,000 for Guard's Excessive Force

*by Matt Clarke*

Exhibit #9 at HCF

On December 7, 2018, a federal district court awarded a Kansas Department of Corrections (DOC) prisoner $250,000 in a lawsuit over a guard's excessive use of force.

Wesley L. Adkins filed a *pro se* civil rights action after he was assaulted by DOC guard Marshal Manning. Manning failed to answer the complaint or otherwise defend himself. The district court granted Adkins' motion for default judgment on the issue of liability and held a hearing on damages. Following the hearing, Adkins was awarded $250,000 in compensatory damages.

In its memorandum and order, the court wrote that Adkins was held in a segregation unit at the Hutchinson Correctional Facility on March 27, 2015 when he went to the morning exercise yard. Prisoners in segregation were allowed to shower each day, but had to sign up on a list. An exception existed for prisoners who went to recreation, who received a mandatory shower after recreation time.

When Adkins finished recreating, the duty officer told him he would be placed on the afternoon shower list. Manning worked the afternoon shift and called out for the showers, but, when Adkins told him he was supposed to be on the list, Manning said he wasn't and refused to let him shower or listen to his attempts to clarify the issue.

Later, Adkins explained the situation to another guard who handcuffed him and led him to the showers. There he encountered Manning, who was argumentative and irritated that Adkins had been allowed to take a shower.

Once Adkins had showered and while he was dressed only in his underwear, the other guard handcuffed him and began escorting him back to his cell. They encountered Manning, a large man known as a mixed martial arts fighter. Surveillance video captured Adkins saying something to Manning, who punched Adkins in the face. Manning then pushed Adkins to the concrete floor, continued punching him, spit on him and placed him in a chokehold. Manning put his foot on a railing to gain leverage and pin Adkins down while choking him.

The other guard ordered Manning to stop, but was ignored. Finally, two more guards arrived and pried Manning off Adkins.

The attack, while brief, caused both physical and emotional injuries. Adkins received medical treatment for abrasions on his face and lip, as well as an ankle injury. Photos taken after the incident showed a thick stream of blood flowing down the side of his face and ear. Adkins was denied an X-ray of his ankle, which was swollen for two days after the attack and, years later, still caused him pain.

Adkins said he also suffered from fear, anguish and anxiety caused by the assault. He submitted a grievance over the incident and was subsequently charged with insubordination and battery in a disciplinary report filed by Manning. He was ultimately acquitted of the disciplinary charges, but spent months housed in a cell with greater restrictions than segregation and had his stay in segregation lengthened due to the charges. Adkins sought mental health treatment for depression, stress and confusion resulting from his being assaulted and then punished despite having done nothing wrong.

Chief U.S. District Court Judge Julie A. Robinson found that the physical and mental injuries caused by Manning's attack when Adkins was "in a truly helpless position" justified an award of the full amount of damages that Adkins requested – $250,000. A bill of costs in the case remains pending. See: *Adkins v. Manning*, U.S.D.C. (D. Kan.), Case No. 5:15-cv-03215-JAR-KGG.

*See also Jackson v. Austin, 241 F. Supp. 2d 1313 (D. Kan. 2003)*

*See also Speer v. Beardsley, et al. KS. D. Ct. %A #20-CV-3075-SAC*

*Polygraph Use*

# KANSAS DEPARTMENT OF CORRECTIONS

| **K**ansas<br>Department of Corrections | **I**NTERNAL<br>**M**ANAGEMENT<br>**P**OLICY AND<br>**P**ROCEDURE | SECTION NUMBER<br><br>12-116D | PAGE NUMBER<br><br>1 of 2 |
|---|---|---|---|
| | | SUBJECT:<br><br>SECURITY AND CONTROL: Polygraph Examinations of Offenders | *Exhibit F* |
| **Approved By:**<br><br><br>Secretary of Corrections | | Original Date Issued: | 11-03-15 |
| | | Replaces Version Issued: | N/A |
| | | CURRENT VERSION EFFECTIVE: | 11-03-15 |

| APPLICABILITY: | _ ADULT Operations Only | _ JUVENILE Operations Only | X DEPARTMENT-WIDE |
|---|---|---|---|

## POLICY STATEMENT

Procedures shall be developed for the administration of polygraph examinations to offenders as may be required to complete an investigation. Polygraph examinations shall be administered only with the offender's written consent. Absolutely no polygraph examinations shall be administered to alleged victims of sexual assault/abuse in connection with the alleged offenses involved.

Polygraph examination results shall not be considered conclusive evidence or utilized as substitutes for facility disciplinary hearings or post incarceration supervision revocation actions. Except when the polygraph is required as a condition of participation in a treatment program, the refusal of an offender to submit to a polygraph examination shall not be the basis for disciplinary or post incarceration supervision revocation actions, or, reported to the offender's file.

Polygraph examinations requested by outside agencies or individuals may be allowed. The agency or individual requesting such an examination shall be responsible for any cost associated with the administration of the examination.

## DEFINITIONS

None.

## PROCEDURES

I. **Offender Consent**

A. The offender's consent shall be obtained using the Offender's Consent to Polygraph Examination form (Attachment A), prior to the administration of any polygraph examination.

II. **Authorization for and Purpose of Polygraph Examinations**

A. No offender shall be requested to submit to a polygraph examination as a part of an internal investigation or on the request of outside agencies or individuals without the prior approval of the warden/superintendent. In making this decision, the following shall be taken into consideration:

1. The matter under investigation;

2. The need to determine if the offender has been truthful during other phases of an investigation; and,