# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PATRICK C. LYNN,

      Plaintiff,

      v.                                 Case No. 5:19-cv-03117-HLT

CHARLIE WILLNAUER, et al.,

      Defendants.

## MEMORANDUM AND ORDER

Plaintiff Patrick C. Lynn brings this pro se prisoner civil rights case under 42 U.S.C. § 1983. He is currently incarcerated at the El Dorado Correctional Facility in El Dorado, Kansas ("EDCF"). The Court granted Plaintiff leave to proceed in forma pauperis. Doc. 28. The Court screened Plaintiff's First Amended Complaint ("FAC") and entered a Memorandum and Order (Doc. 45) ("M&O") dismissing various claims and defendants in the FAC.

For Plaintiff's remaining claims, the Court directed officials responsible for the operation of the Lansing Correctional Facility ("LCF") and the Hutchinson Correctional Facility ("HCF") to prepare a *Martinez* Report regarding Plaintiff's medical care on May 25, 2019 at LCF; June 26–28, 2019 at LCF; December 30–31, 2019 at HCF; and December 23, 2020 at LCF. The M&O provides that "[o]nce the report has been received, the Court can properly screen Plaintiff's medical claims under 28 U.S.C. § 1915." Doc. 45, at 23–24. The *Martinez* Report (Doc. 63) (the "Report") has been filed, and Plaintiff has responded to the Report (Docs. 80, 81).[1]

---

[1] Plaintiff's Response includes allegations and exhibits related to his complaints against a District Judge of this Court, including claims regarding other cases, i.e., Case No. 19-3003-EFM and Case No. 20-3116-EFM (imposing filing restrictions against Plaintiff). *See* Response, Doc. 80, at 2; Doc. 80–1, at 7–18. These claims and issues are irrelevant to the current case.

This matter is before the Court for screening the remaining claims in Plaintiff's FAC pursuant to 28 U.S.C. § 1915A. The Court's screening standards are set forth in the Court's M&O. Doc. 45, at 17–19.

## I. EXHAUSTION

The Report addresses the merits of Plaintiff's claims, but it also alleges that Plaintiff has failed to properly exhaust his administrative remedies. The issue of Plaintiff's failure to exhaust his available administrative remedies before filing his lawsuit must be determined before reaching the merits of his lawsuit.

### A. Exhaustion Requirement

An inmate is required by the Prison Litigation Reform Act ("PLRA") to exhaust all available prison administrative remedies before filing a complaint in federal court. Section 1997e(a) expressly provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).[2] "Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."[3]

---

[2] *See also Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010) (stating that under the PLRA "a prisoner must exhaust his administrative remedies prior to filing a lawsuit regarding prison conditions in federal court") (citations omitted).

[3] *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002) (citation omitted); *see also Jones v. Bock*, 549 U.S. 199, 219 (2007) (stating that "the benefits of exhaustion include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record") (citations omitted).

This exhaustion requirement "is mandatory, and the district court [is] not authorized to dispense with it."[4] An inmate exhausts by complying with "an agency's deadlines and other critical procedural rules."[5] A prison or prison system's regulations define the steps a prisoner must take to properly exhaust administrative remedies and a prisoner "may only exhaust by properly following all of the steps laid out" therein.[6] "An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under [the] PLRA for failure to exhaust his administrative remedies."[7] "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."[8]

In a suit governed by the PLRA, failure to exhaust is an affirmative defense and the defendant has the burden of proof regarding exhaustion of administrative remedies.[9] The issue of Plaintiff's failure to exhaust his available administrative remedies before filing his lawsuit must be determined before reaching the merits of his lawsuit.[10]

For Kansas state prisoners, the administrative remedies require the inmate to seek an informal resolution with personnel who work with the inmate on a daily basis.[11] If the informal resolution is unsuccessful, the inmate must progress through a three-level process that includes

---

[4] *Beaudry v. Corrections Corp. of Am.*, 331 F.3d 1164, 1167 n. 5 (10th Cir. 2003), *cert. denied*, 540 U.S. 1118 (2004); *Little*, 607 F.3d at 1249; *Gray v. Sorrels*, 818 F. App'x 787, 789 (10th Cir. 2020) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." (quoting *Jones*, 549 U.S. at 211)).

[5] *Id.* (quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)).

[6] *Little*, 607 F.3d at 1249 (citing *Woodford*, 548 U.S. at 90).

[7] *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (citation omitted).

[8] *Jones*, 549 U.S. at 218.

[9] *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007).

[10] *Little*, 607 F.3d at 1249 ("unexhausted claims cannot be brought in court") (citation omitted); *see also Jernigan*, 304 F.3d at 1032 (an inmate who does not complete the grievance process is barred from pursuing a §1983 claim).

[11] K.A.R. § 44–15–101(b).

submitting a grievance report form to (1) the appropriate unit team member, (2) the warden of the facility, and (3) the office of the secretary of corrections.[12] The procedure to follow at each level is described in detail in Kan. Admin. Regs.[13]

As this Court has previously found, there are two distinct avenues of administrative exhaustion established in Kansas law:

> The first avenue is found in the regulations codified by Article 15 of chapter 44 of the Kansas Administrative Regulations. These regulations govern inmate grievances covering "a broad range of matters that directly affect the inmate, including" complaints about policies and conditions of imprisonment, actions of employees and other inmates, and incidents occurring within the facility. Kan. Admin. Regs. § 44–15–101a(d)(1)(A)–(B). As the Court previously determined, this regulation applies to a constitutional claim such as the one asserted here, where the conduct complained of stems from "actions by employees" of the prison facility. *Id*. § 44–15–101a(d)(1)(B).[14]

 "The second avenue is governed by the regulations in Article 16 of chapter 44 of the Kansas Administrative Regulations."[15] Kan. Admin. Regs. § 44–16–104a applies to claims for personal injury and provides: "(a) Each inmate claim for personal injury shall be submitted to the [prison] facility and [the] secretary of corrections within 10 calendar days of the claimed personal injury."[16]

The Kansas Court of Appeals has explained that the two sets of regulations found in Articles 15 and 16 are "separate and distinct" from one another.[17] Indeed, the regulation "expressly

---

[12] K.A.R. § 44–15–101(d).

[13] § 44–15–102; *see also Garza v. Correct Care Solutions*, 2011 WL 2580299, at *2 (D. Kan. 2011), *aff'd* 451 F. App'x 775 (10th Cir.) (granting summary judgment for failure to exhaust claims against Correct Care Solutions where plaintiff failed to allege that he sought relief on his claims first through his unit team, then the warden, and finally from the Secretary of Corrections).

[14] *Lewis v. Carrell*, 2015 WL 413640, at *2–3 (D. Kan. 2015).

[15] *Id*. at *3.

[16] *Id*. (citing Kan. Admin. Regs. § 44–16–104a).

[17] *Id*. (citing *Redford v. Kan. ex rel. Dep't of Corr.*, 295 P.3d 1054, 2013 WL 781102, at *6 (Kan. Ct. App. Mar. 1, 2013 (unpublished table decision)).

provides: 'The grievance procedure [in article 15] shall not be used in any way as a substitute for, or as part of, the  . . . property loss or personal injury claims procedure [in Article 16] . . .'"[18]

The court in *Conley* addressed the defendants' argument that the plaintiff failed to file a personal injury claim in a § 1983 case, and noted that while case law establishes that exhaustion of Article 15's procedures alone is not sufficient for a plaintiff to assert a personal injury claim, the court "had not located any authority requiring an inmate to exhaust both the requirements of Article 15 and Article 16 before asserting a § 1983 claim based on an alleged violation of an inmate's constitutional rights" and declined to invent such a requirement.[19] However, the court did find that exhaustion under § 44–15–101 was necessary for the plaintiff's § 1983 claim.[20] The court found that where the plaintiff asserted a § 1983 claim for failure to provide proper dental care, the plaintiff's claim constituted a complaint about the conditions of his imprisonment and the actions of employees, which requires exhaustion under Kan. Admin. Regs. § 44–15–101.[21] Likewise, the court in *Nunez*, stated that "an inmate who wishes to pursue both a personal injury claim and a § 1983 claim must comply with two distinct sets of administrative procedures even if he bases his claims on a single act."[22] The court held that "Article 15 of the KDOC regulations covers the administrative procedures that must proceed a § 1983 claim."[23]

---

[18] *Id*. (quoting Kan. Admin. Regs. § 44–15–101a(d)(2); *see also Sharrock v. Stephens*, 2011 WL 5526444, at *1 (D. Kan. 2011) ("Importantly, the requirements in [§ 44–16–104a] apply regardless of whether the inmate pursues a grievance pursuant to § 44–15–101.").

[19] *Conley v. Pryor*, 2015 WL 413638, at *14 (D. Kan. 2015).

[20] *Id*.

[21] *Id*.

[22] *Nunez v. Heimgartner*, 2017 WL 2264466, at *5 (D. Kan. 2017) (citation omitted).

[23] *Id*. at *6 (citation omitted); *see also Jones v. Parks*, No. 19-cv-3175-HLT-GEB, Doc. 50 at n.3 (D. Kan. April 13, 2021) ("Plaintiff's alleged personal injury claims based off the same incidents does not exhaust his § 1983 claim.").

Based on the Report, Plaintiff's response, and prior caselaw, it appears that there is some merit to the claim that Plaintiff has failed to exhaust his administrative remedies before filing this action. However, this case is not in the proper posture to address this issue. Exhaustion is an affirmative defense, and Defendants have not been served in this case. The Court is ordering service on the remaining Defendants. Once served, the deadline set forth in the waiver or summons shall control the deadline for an answer or other responsive pleading. This same deadline shall apply to any dispositive motion on the issue of exhaustion. *See Kilman v. Brown*, 2021 WL 4057687, at n.3 (10th Cir. Sept. 7, 2021) (unpublished) ("[W]e have routinely found it appropriate for district courts to reject claims on summary judgment that an inmate has failed to properly exhaust.") (citation omitted).[24]

## II.  MERITS

The only remaining claims from Plaintiff's FAC are his Eighth Amendment claim in Count I and his state law medical malpractice claim in Count II regarding his medical care on the following dates:  on May 25, 2019 at LCF; June 26–28, 2019 at LCF; December 30–31, 2019 at HCF; and December 23, 2020 at LCF. Regarding medical care on these dates, the M&O directed that the Report should address: "the failure to provide Plaintiff with pain medication; the delay in receiving troponin test results; and the failure to transport Plaintiff to the hospital in light of elevated troponin test levels." Doc. 45, at 24, 45.

The allegations in Plaintiff's FAC are set forth in detail in the Court's M&O. Doc. 45, at 4–19. In summary, Plaintiff alleges that he had a quadruple bypass operation on July 3, 2014, and

---

[24] For example, Elizabeth Smith did not find any grievances for the HCF incident on December 30-31, 2019 but did find two property/personal injury claims and found preliminary parts of two grievances that had not been exhausted and three pieces of correspondence. Doc. 63, at 16-18. Likewise, the Report suggests that Plaintiff failed to exhaust his medical care claims at LCF. It noted that Brett Peterson did not find any correspondence from Plaintiff regarding medical care at LCF and that Keeton Hartley found no grievances but did find three personal injury claims. *Id.* at 22-23. Plaintiff responded to these allegations.

was advised by the heart surgeon that the entire bottom half of his heart is dead muscle. He has suffered multiple heart attacks and hospitalizations every year since the heart surgery. Plaintiff has been advised by doctors and cardiologists that his heart condition cannot be remedied by any further surgery or stents and that the only thing keeping him alive is the stack of heart medications he is prescribed by multiple cardiologists. Plaintiff claims that the "gold standard" for testing his individual condition is a troponin test and Plaintiff's base level was determined to be 0.002 in 2018 and 0.001 in 2019. Plaintiff takes issue with the medical care he received on the various dates, including the failure to follow chest-pain protocols, the failure to promptly test his troponin levels, the failure to provide pain medication, and the failure to transport him to the hospital.

### A. Defendants Melissa Doe, Mary Yoakum, Michele Layton, Janice Gunter, Faye Vargas, Brian Burns, Duane Denton, Barbara Dickerson, Bob Pritchard, and Rajwinder Kaur

The Court finds upon further screening of Plaintiff's FAC that Plaintiff's claims against several Defendants should be dismissed for failure to state a claim. The Report provides that nurses cannot order troponin tests and the on-call physician must order and interpret the test. Doc. 63, at 9; Doc. 63–3 (Lundry Affidavit); Doc. 63–8, at 2 (Dickerson Affidavit); Doc. 63–38, at 2 (Monir Affidavit).

Plaintiff alleges in his FAC that on May 26, 2019, RN Melissa, along with LPN Sinclair, took Plaintiff's blood pressure and then left him for about 45 minutes. Doc. 43–3, at 9. He claims that because these nurses refused to attend to his condition, the Captain summoned RN Tom to assess Plaintiff and RN Tom enacted the chest-pains protocol. *Id*. Plaintiff alleges that RN Tom wrote disciplinary reports on the other two nurses, but HSA McCullough did nothing to hold either nurse accountable. *Id*. at 10. Plaintiff's allegations fail to state a claim against RN Melissa.

Plaintiff alleges that Defendant Yoakum took Plaintiff's troponin sample on June 26, 2019, and was alarmed that the doctors had refused to send Plaintiff to the hospital. *Id.* at 11. Plaintiff's allegations fail to state a claim against Mary Yoakum.

Plaintiff alleges that when he returned to LCF from KU Medical Center on June 25, 2019, he was placed in the LCF clinic ER a few hours later and was assessed by Nurses Layton and Gunter. *Id.* at 10. He claims that both nurses "followed the chest pains protocol & took another Traponin stat sample that came back at 0.116" and Plaintiff was readmitted into the infirmary. *Id.* Plaintiff claims that he was denied pain medication and was discharged despite another troponin result coming back at 0.117. *Id.* at 11. Plaintiff has failed to state a claim against Nurses Layton and Gunter.

Plaintiff has also failed to state a claim against RN Faye Vargas-Hoffman.  The Report states as follows:

> On December 31, 2019, at 2:56 p.m. Registered Nurse Faye Vargas-Hoffman took plaintiff's blood pressure, which read 142/80. Plaintiff loudly reported that he was not provided with his Keep On Person (KOP) medications and also that he had not had a blood draw taken in accordance with the order he stated Dr. Monir ordered that morning. Nurse Vargas-Hoffman spoke with the infirmary nurse Terry Webster, conducted a chart audit and found no such orders. Plaintiff was told to contact the clinic if his symptoms developed or worsened. The next day on January 1, 2020, at 7:10 p.m. plaintiff complained to RN Vargas-Hoffman about his KOP medications, his diet and his lab results and was told they were the result of a chart audit conducted by Health Services Administrator Debra Lundry. The only other contact RN Vargas-Hoffman had with plaintiff between May 23, 2019, and December 2020 was when he approached her on January 6, 2020, at 9:39 a.m. to ask for anti-nausea medication and to tell her that he refused to be seen at the new clinic (where he was housed from December 30, 2019, to December 31, 2019) because he would be corruptly assessed. This was not an issue because plaintiff was transferred to the El Dorado Correctional Facility the same day. (Vargas-Hoffman Affidavit Exhibit 9).

Doc. 63 at 14.

Plaintiff fails to state a claim against Director of Nursing Brian Burns. Plaintiff mentions in his FAC that when he returned to LCF after being hospitalized at the KU Medical Center on December 23, 2020, he "struggled for weeks thereafter w/zero followup & deliberate indifference by DON/RN Brian Burns to such facts & needs." Doc. 43–3, at 18. Plaintiff's conclusory allegations without any factual support fail to state a claim.

Plaintiff claims in his FAC that on December 30, 2019, while in the HCF Infirmary, Nurses Denton[25] and Dickerson[26] claimed that Plaintiff's troponin level came back at 0.007, which Plaintiff claims "was absurd in the face of having a sky-high racing B/P" and other symptoms. Doc. 43–3, at 13. Plaintiff claims that from 6 pm on December 30 until 10:30 am on December 31, 2019, these nurses refused to give him pain medication and heart medication, and did not reassess his blood pressure or take another troponin test. *Id*. In his response to the Report, Plaintiff continues to dispute that the results were 0.007 and claims that what Dickerson did to Plaintiff was "blatant medical malpractice" and she was also involved in the medical malpractice of another HCF resident. Doc. 80, at 2. He also claims that Denton and Dickerson denied him "hands-on" assessments of his condition. *Id*. at 3. Later, Plaintiff states that Captain Koob "refused to summon the nursing staff to simply take [his] B/P & see what the racing B/P was & irregular heartbeat indicators." *Id*. at 4.

RN Dickerson provides in her affidavit that on December 30, 2019, Nurse Denton received a phone call from Dr. Harrod indicating that Plaintiff's troponin levels were normal and that Plaintiff would not be admitted to the hospital. Doc. 63–8, at 3 (Dickerson Affidavit). Although

---

[25] The Report indicates that Duane Denton is deceased. Doc. 63, at 12.

[26] Although Plaintiff lists this defendant's surname as Dickinson, the Report provides that the proper name is Barbara Dickerson.

Plaintiff disputes the results of the troponin test, he has not stated a sufficient claim against Nurses Denton and Dickerson.

Plaintiff claims that RN Pritchard, along with others, came to Plaintiff's Infirmary room at HCF on the morning of December 31, 2019. Doc. 43–3, at 13. Plaintiff claims that RN Pritchard took Plaintiff's blood pressure and then Dr. Monir told Pritchard to take a troponin sample "stat" because they might be sending Plaintiff to the hospital again. *Id*. As Plaintiff was being escorted, they encountered Pritchard, who indicated that he had not heard Dr. Monir order such, there was no such order in the records, and that he would attempt to reach Dr. Monir to verify the order. *Id*. at 14. Later, Plaintiff was assessed by RN Faye Vargas, and she indicated that Dr. Monir was not answering his radio or cellphone and that she could not authorize a troponin sample to be taken. *Id*. Plaintiff's allegations show that RN Pritchard followed the doctor's written orders and attempted to resolve the situation by attempting to reach Dr. Monir to verify the order. Plaintiff has failed to state a claim against RN Pritchard.

Plaintiff mentions in his FAC that he was readmitted to the infirmary on June 25, 2019, per APRN Kaur and Dr. Lewis-Harris. Doc. 43, at 10. Plaintiff alleges that he was denied pain medication on June 26, 2019 "per Dr. Willnauer & Dr. Lewis-Harris" and that his pleas to be taken to the hospital were denied by "APRN Kaur & HSA McCullough & per both doctors." *Id*. at 11. Plaintiff alleges that his "pleas to RN Gardner" to speak to medical staff, including Kaur, were ignored the next day. *Id*. Plaintiff has failed to state a claim against APRN Kaur. Nothing in Plaintiff's allegations suggests Kaur was doing anything other than following doctors' orders or that he somehow had the authority to override those orders.

### B. Remaining Defendants

The Report provides that Plaintiff is a 65-year-old male with a history of severe coronary

artery disease, Chronic Angina (chest pain), and chronically elevated troponin levels. Doc. 63, at 9; Doc. 63–3 (Lundry Affidavit); Doc. 63–8, at 2 (Dickerson Affidavit); Doc. 63–38, at 2 (Monir Affidavit). The Report further provides that the normal range for troponin is between 0 and 0.4 ng/ml; a blood draw is necessary to measure troponin and the test is done off-site; and a nurse cannot order the test and the on-call physician must order and interpret the test. *Id*. The Report also alleges that Plaintiff has psychiatric issues which include anxiety disorder. Doc. 63–38, at 2 (Monir Affidavit). The Report sets forth several instances when Plaintiff's behavior allegedly impaired medical staff's ability to provide care. *See, e.g.,* Doc. 63–3, at 4 (alleging that HCF staff attempted to examine Plaintiff with an EKG but were unable to due to Plaintiff's uncooperativeness, and Plaintiff would not stop tapping on his chest and moving his arms around which ultimately impaired the test results.);[27] Doc. 63–8, at 3 (alleging that on December 30, 2019, while waiting for his troponin test results, Plaintiff verbally abused RN Dickerson and other healthcare providers present, specifically telling RN Dickerson that she was a stupid nurse, a dumb bitch, and that he would have everyone's asses and kill them); Doc. 63–38, at 3–4 (alleging that on December 30, 2019, during his admission to the HCF infirmary, Plaintiff was combative with the nurse on duty, including swearing at and threatening to kill or have friends of his on the outside kill the nurse.); *Id*. (alleging that on the morning of December 31, 2019, Plaintiff was yelling that he was in chest pain, but when the nurse and two officers entered his cell, he told them to "Get the hell outta here" and alleging that later that morning, Plaintiff refused to have his vitals measured by the nurse and continued to yell and swear, and threatened to kill the nursing staff member who responded when

---

[27] The Report also alleges that Plaintiff was uncooperative with staff throughout the night on December 30, 2019. The report states that he jumped off his bed screaming at the HCF staff that he was going to kill them all and then he continued shouting obscenities at the HCF staff and banging on his door. It alleges that later, Plaintiff threatened the HCF staff's families saying that he would kill all of them also. And it states that on the morning of December 31, 2019, Plaintiff remained uncooperative and continued to threaten HCF staff. *Id*.

he pressed his call light).

Plaintiff disputes the allegations in the Report and maintains his allegations as set forth in his FAC.[28]  Plaintiff alleges that the affidavits submitted with the Report are "rote recitations of blatant perjurous statements & blatant examples of malpractice." Doc. 80, at 3. He also disputes the declarations that a normal troponin level ranges between 0 and 0.4. *Id*. To refute these declarations, Plaintiff submits the Affidavit of Carmen G. Baynham, APRN, which was submitted in another one of Plaintiff's cases. Doc. 80–1, at 1–6. Baynham's affidavit provides that troponin refers to a group of proteins that help regulate contractions of the heart and skeletal muscles; a normal range for this protein is below 0.055 ng/ml; and a probable heart attack is above 0.056 ng/ml. Doc. 80–1, at 3. The Court notes that in her affidavit, Baynham also describes Plaintiff as having a history of severe coronary artery disease, chronic angina (chest pain) and chronically elevated troponin levels. Doc. 80–1, at 2. She declares that "[a]n administrative note entered by a physician at Lansing on June 27, 2019 noted that hospital physicians recorded Mr. Lynn may have normally high troponin levels, chest pain may be more related to irritation from prior CABG as there was no evidence of demand ischemia (lack of oxygen to the heart related to exertion)."  *Id*. at 3.

Plaintiff disputes that he has a "chronically elevated troponin level" (Doc. 80, at 7); that he has psychiatric issues (*id*. at 15); or that he has ever taken Zoloft or Klonopin (*id*.).  The *Martinez* Report "is treated like an affidavit, and the court is not authorized to accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall v. Bellmon*,

---

[28] In his response, Plaintiff once again asks the Court to refer this matter to the U.S. Attorney's Office for investigations and presentation to a grand jury. Doc. 80, at 1. The Court denies the request for the same reasons set forth in denying Plaintiff's previous requests for this same relief. *See* M&O, Doc. 45, at 41–42 ("Plaintiff has raised similar requests in prior cases and has been informed that he is not entitled to this relief") (citing *Lynn v. Cline*, Case No. 19-3003-CM (D. Kan. May 7, 2019) (Doc. 15, at 13–14)).

935 F.2d 1106, 1111 (10th Cir. 1991) (citing *Sampley v. Ruettgers*, 704 F.2d 491, 493 n. 3 (10th Cir. 1983)). Therefore, the remaining claims in Plaintiff's FAC survive screening.  The Court will order the remaining Defendants to answer or otherwise respond to these remaining claims.

## III.  CONCLUSION

The Court finds that this case survives screening on the remaining issues: Plaintiff's medical care on May 25, 2019 at LCF; June 26–28, 2019 at LCF; December 30–31, 2019 at HCF; and December 23, 2020 at LCF. The Court did not order service in the M&O. Doc. 45, at 44. The Court will now direct the Clerk to serve the remaining Defendants. The answer deadline set forth in the waiver or summons shall also serve as the deadline for any dispositive motion on the issue of exhaustion.

THE COURT THEREFORE ORDERS that the Clerk is directed to correct the following names on the docket:  Defendant (FNU) Dickinson shall be corrected to Barbara Dickerson; (FNU) Monir shall be corrected to Ziauddin Monir, M.D.; and (FNU) Koob shall be corrected to Todd Koob.

THE COURT FURTHER ORDERS that the following Defendants are dismissed from this action:  Melissa Doe, Mary Yoakum, Michele Layton, Janice Gunter, Faye Vargas, Brian Burns, Duane Denton, Barbara Dickerson, Bob Pritchard, and Rajwinder Kaur.

THE COURT FURTHER ORDERS that the Clerk is directed to send waivers to the following Defendants: Dr. Charlie Willnauer; HSA Aleycia McCullough; Debra Lundry; Todd Koob; Ziauddin Monir, M.D.; and Dr. Barry Lewis-Harris.

IT IS SO ORDERED.

Dated: August 1, 2022                           /s/  *Holly L. Teeter*
                                                HOLLY L. TEETER
                                                UNITED STATES DISTRICT JUDGE